## UNITED STATES *v.* HUMASON.

*(Circuit Court, D. Oregon. July 22, 1881.)*

1. **OFFICIAL BOND—PROOF OF EXECUTION.**

   In an action upon an official bond, if the execution thereof is denied, it cannot be proven by a copy certified by the secretary of the treasury under section 882 of the Revised Statutes, but a copy certified by the register of the treasury under the seal of the department, under section 886 of the Revised Statutes, is sufficient proof of such execution, it being declared to have the same force as the original when duly authenticated or proven in court.

2. **NONSUIT BY THE PLAINTIFF.**

   Under section 243 of the Oregon Code, the plaintiff in an action can only become nonsuit before the trial commences, or afterwards, with the consent of the defendant; and this is considered the later and better rule generally.

3. **NEW TRIAL—STALE CLAIM.**

   The United States delayed bringing an action against the sureties in the bond of a deceased Indian agent in Oregon, for an alleged failure to account for $7,000 or $8,000 received thereunder, for a period of 14 years; and on the trial there was a verdict for the defendant, by the direction of the court, because of the failure of the plaintiff to produce proof of the execution of the bond, which was denied, as provided in section 886 of the Revised Statutes. *Held,* that the plaintiff was guilty of negligence, and therefore was not entitled to a new trial; and that in passing upon the motion weight ought to be given to the fact of the long delay in bringing the suit, whereby it had become difficult, expensive, and almost impossible to make legal proof of facts which probably existed tending to show that the deceased had duly disbursed the money in question.

4. **STIPULATION TO ABIDE EVENT OF ANOTHER ACTION.**

   A stipulation in one action to abide the event of another entitles either party thereto to such proceedings in the former as will enable him to have the benefit of his stipulation, provided the result of the latter action is favorable to him.

Action at Law.

*Rufus Mallory*, for the United States.

*Seneca Smith*, for defendant.

DEADY, D. J.   This action is brought against the defendant, Phœbe M. Humason, as executrix of the will of Orlando Humason, on two bonds executed by William Logan in his life-time, as Indian agent, together with said Humason and others as sureties,—the one on August 1, 1861, in the penal sum of $25,000, and the other on July 1, 1862, in the sum of $20,000, and both conditioned that said Logan would "carefully discharge the duties" of said office, and "faithfully expend all public moneys and honestly account for the same, and for all public property which shall or may come into his hands, without fraud or delay.   The case was first before the court on a demurrer to the complaint, which was overruled on June 7, 1879, (see opinion of that date.)   It was again before the court on a demurrer to the third, fourth, and fifth pleas or defences contained in the answer, which was overruled on December 15, 1879, (see opinion of that date,) and on June 2, 1880, the plaintiff replied to the answer, and the cause was at issue upon questions of fact.   On February 19, 1881, the cause was tried with a jury and a verdict was given for the defendant.

On the trial the plaintiff proved the commissions to Logan, as Indian agent, under which the bonds were executed as alleged in the complaint, and then offered in evidence the transcripts of two bonds, purporting to have been executed by William Logan, as Indian agent and principal, and O. S. Savage, W. C. Moody, H. P. Isaacs, and O. Humason, as sureties, on August 1, 1861, and July 1, 1862, respectively, and certified by the secretary of the treasury, under the seal of the department, on April 20, 1878, in pursuance of section 882 of the Revised Statutes, to be true copies of bonds on file in that department. The execution of the bond by the defendant's testator being denied by the answer, the introduction of the transcripts was objected to by counsel, because they were not certified to under and in the manner prescribed by section 886 of the Revised Statutes, instead of section 882 thereof, and the objection was sustained.   The plaintiff then asked to become nonsuit, but the defendant objected, and asked that the case be submitted to the jury, which was done, with direction to find a verdict for the defendant.

In the case of the *U. S.* v. *Isaacs*, it being an action upon the same bonds, there was a stipulation that it should abide the event of this action, and thereupon an order was made directing the latter to be included in the entry of the trial and verdict of the former; and the

case of the *U. S.* v. *Savage,* another surety in the same bonds, standing upon a similar stipulation, was also included in such order. On April 11th the plaintiff filed a motion for a new trial, which was argued and submitted on May 11th. It is not claimed that the court erred in refusing to allow the plaintiff to become nonsuit. By section 243 of the Oregon Code a nonsuit cannot be granted on the motion of the plaintiff only, before trial or afterwards, without the consent of the defendant; and the later and better rule of the common law is to the same effect. Whenever the trial has been commenced, the right of the plaintiff to become nonsuit, and vex and harass the defendant with another action for the same cause, is gone. *Folger* v. *The Robert G. Shaw,* 2 W. & M. 531.

The power to grant a new trial is sufficient to prevent a failure of justice in the cases where a nonsuit was formerly suffered by the plaintiff to meet a surprise caused by the failure of evidence, or an unexpected ruling of the court; in which proceeding the court may impose such terms and conditions upon the moving party as a due regard to the rights and convenience of the other may require. Neither is it claimed that the court erred in refusing to admit the copies of the alleged bonds in evidence; because it is admitted that a copy of a bond certified under said section 882 is not evidence of the execution of such bond where the same is denied, but that it must be certified under section 886, by the register, subject to the right of the defendant to call for the production of the original instrument.

But a new trial as to the case of Humason is asked for on the ground of "accident on the part of the secretary of the treasury in certifying the copies of the bonds upon which the action" is brought under section 882 of the Revised Statutes, instead of section 886 thereof, "which mistake was not discovered by the attorney for the United States until at the trial, when the error was first discovered; the papers in the case having been forwarded to the attorney for the United States by the department of justice at Washington." These certificates were made nearly three years before the trial, and the answer denying the execution of the bonds, and which first made it necessary to have copies of them certified by the register of the treasury, under section 886, was filed on August 6, 1879,—at least 18 months before the trial.

Upon this state of facts there is no ground to claim that the plaintiff was, in contemplation of law, surprised at the trial by the rejection of the copies of the bonds. The secretary of the treasury did not by either "accident" or mistake certify to copies of the bonds

under the wrong section. When he made his certificate it was not known that the execution of the bonds would be denied; neither was the secretary authorized to make a certificate under any other section than the one he did. Besides, the mistake or "accident" of the secretary, if any, is the mistake or accident of the plaintiff, whose officer and agent he is. The copies of the bonds certified by the secretary were furnished to the district attorney, together with a transcript of the treasury books, accounts of the agent, and affidavits relating to them, to enable him to bring the proper action thereon; and when an issue of fact, if any, was made therein, it then became his duty to procure the proper evidence for the trial thereof. So, when the defendant denied the execution of the bonds, the burden of proof being cast upon the plaintiff, it was the duty of the district attorney to procure the proper evidence of such execution—a copy of the bonds, certified by the register of the treasury under section 886—before going to trial.

No excuse is given or offered for this negligence. The probability is that it occurred from inadvertence in not observing or bearing in mind the provision in the statute or the denial in the answer, or both. But in either case the omission is the negligence of the plaintiff, for which a new trial ought not to be granted; at least, not unless what is sometimes called "the justice of the case" strongly demands it, and then only upon terms compensatory to the adverse party. But upon a careful examination of the treasury transcripts, and the circumstances of the case as shown in the pleadings, I do not think the ends of justice demand a new trial in this case, but the contrary. In this view of the matter the execution of the bonds by Humason may be admitted. The denial by the defendant is only a constructive one at best—a denial of "knowledge or information sufficient to form a belief" upon the question—and it may be taken for granted that upon a new trial the plaintiff would be able to establish that fact beyond a doubt.

But the default of the principal, if any, and his death, occurred nearly 14 years before this action was brought against his sureties, and 16 years before it was brought to trial. Owing to the great lapse of time and the death of the principal it is difficult if not impossible to ascertain and make legal proof of facts affecting their liability, that very probably exist, and might have been shown with sufficient certainty, if this action had been brought within a reasonable time. And although the maxim, *nullum tempus occurrit regi*, applies to the United States as well as the crown, and therefore its right to bring

this action is not barred by any lapse of time, still, upon a motion for a new trial, where a verdict has been obtained by the defendant, the court must take into consideration the hardship, if not injustice, of compelling the sureties under such circumstances to account for money received by their principal so long ago, and particularly when, by his sudden death, he was prevented from making and returning an account of it himself. True, the sureties were not without obligation and duty in this matter themselves; and if this consideration was now being urged as a reason why this action should not be maintained against the sureties, it might well be answered that, having undertaken for their principal, it was their duty to see that he kept the condition of his bond or take the consequences, and that when he died away from home, with his accounts more than a quarter in arrear, it was their duty, through the appointment of an administrator and otherwise, to have his accounts made up and forwarded to the department for settlement. But this is a motion to set aside a verdict obtained by the defendant without any fault of hers, and the neglect of the plaintiff in asserting this claim until it has become stale, may be properly considered thereon.

The count upon the first bond alleges a failure to account for $1,006.60 received by Logan between August 1, 1861, and June 30, 1862, while in charge of the Warm Spring agency. This sum is made up of $978.74 that appears from Logan's verified statement to the department to have been in his hands on June 30, 1862, and belonging to various specified funds applicable to the business of his agency; and $27.32 disallowed at the department in the examination of his accounts under the first bond. But it also appears from Logan's account current with the department for the quarter ending June 30, 1862, that the very same funds, amounting to $978.74, were on July 1, 1862, credited to the United States by him under his second bond. And thus it appears from the treasury transcript itself that nothing is due upon the first bond, and therefore nothing ought to be recovered on it. The trifling differences between his accounts and the audit of the department, amounting in the aggregate to $27.32, in a total expenditure of $11,562.35 received under said bond, is not sufficient to affect the question.

The count upon the second bond alleges a failure to account for $7,678.66, received by Logan between July 1, 1862, and May 19, 1865. This sum is made up of $5,781.01 that appears from Logan's verified statement to the department to have been in his hands on March 31, 1865, and belonging to various specified funds applicable

to the business of his agency,—of which $3,975.41 was applicable to the erection of a hospital, school, and dwelling-house; $1,568.44 to the payment and subsistence of specified employes; $121.93 to beneficial objects under article 2 of the treaty of June 25, 1855, with the Indians of middle Oregon, (12 St. 963;) and $135.23 to expenses, —and the remaining $1,897.65 of money received by the agent on the checks of Superintendent Huntington drawn on the assistant treasurer at San Francisco, dated May 5 and paid May 19, 1865.

Some time early in June, 1865, Agent Logan appears to have taken his wife to San Francisco for medical treatment, where he remained until July 28th, when they sailed for Oregon on the steamer Brother Jonathan, and, on July 30th, were both lost by the foundering of the vessel off Crescent City, California, with all their effects then on board.

For this reason, I suppose, no account of moneys expended at the agency in charge of the deceased after March 31, 1865, was returned or is found in the treasury transcript; but it is quite certain that the business of the agency went on as usual during Logan's absence, and that the funds applicable to the payment and subsistence of employes and current expenses were disbursed by the person in charge for the quarter ending June 30, 1865. It is also very probable that the portion of the funds on hand and applicable to the erection of the buildings being erected on the agency was largely expended during this quarter. It was not the policy of the department or the law to advance an agent at any time more funds than were needed for the expenditures of the current quarter.

The probabilities then are that this sum of $5,781.01, that agent Logan reported on hands on March 31, 1865, was all, or nearly all, expended on the reservation by the end of the quarter following, and that upon the death of himself and wife there was no one left with interest enough in his affairs to have his accounts for the period subsequent to March 31, 1865, made up and forwarded to the department with the proper vouchers. The remaining $1,897.65 is made up in the treasury statement in this way: On April 29 and May 8, 1865, Logan appears to have receipted to Superintendent Huntington for the sums of $2,500 and $500, respectively; and on May 19, 1865, the superintendent's checks on the assistant treasurer at San Francisco, for the sums of $2,000 and $1,000 respectively, and dated May 5, 1865, payable to William Logan or bearer, were paid to bearer, whoever that may have been, at that office. It seems to be admitted or taken for granted in the treasury statement that these two checks represent the money that

Logan receipted to the superintendent for as above stated, and this I think is very probable. The discrepancy in dates and amounts between the receipts and checks probably arises from the fact that the receipts were not taken until some time after the checks were given, and it may be not until after Logan's death, when blanks were filled up for the gross amount, with conjectural dates and sums in each, as a voucher for the use of the superintendent.

By the treasury statement, Logan is charged under his second bond with this $3,000, in addition to the amount which it appears from his accounts that he received under said bond; and also the sum of $217.38, differences between his account current of disbursements between July 1, 1862, and March 31, 1865, amounting to near $50,000, and the audit of the treasury, arising principally from trifling errors in calculation and the non-payment or deduction of the small sums due the income tax from the salary or subsistence of the employes on the reservation during that period, together with $178.11 for the property purchased in the first quarter of 1865, and not taken up on his property returns, on account probably of his absence and sudden death.

From this amount is deducted the salary due the agent from April 1 to July 28, 1865, the assumed date of his death—$489.13; and the $978.74 aforesaid, in the agent's hands on June 30, 1861, under his first bond, and carried in his account on July 1, 1861, to the credit of the United States, under his second bond; and $29.98 which I have not discovered the origin of,—the total of the debits being $3,395.49, and the credits $1,497.84, leaving the balance as above stated of $1,897.65.

One of the defences to this action is in effect that Logan was carrying $5,000 of the funds unaccounted for to Oregon, as the agent of the plaintiff, when he was drowned, which was lost without his fault or negligence. But by the schedule of checks drawn by Superintendent Huntington on the assistant treasurer in San Francisco between May 1 and July 31, 1865, it does not appear that within this period any other checks in favor of Logan were paid than the two above mentioned for $3,000, except one for $10,000, drawn on June 10, and paid to Logan on June 20, 1865. This latter check appears to have been drawn for the use of the superintendent, and although the proceeds appear to have been received by Logan more than five weeks before he sailed for Oregon, it may be admitted that he had the amount in currency with him when he was drowned, and that it was then lost without his fault or that of the super-

intendent. Upon this theory, the act of July 12, 1876, (19 St. 447) has been passed for the relief of the deceased superintendent's sureties, by which the accounting officers of the treasury are directed to credit his accounts with the amount, provided satisfactory proof is made of the loss. But Logan is not charged with this $10,000, and the question of its loss is immaterial so far as his accounts are concerned. It does not appear that Logan had any of the $3,000 received on the two checks dated May 5th, and paid May 19th, in his custody when he was lost. He does not appear to have gone to San Francisco before June, and probably left Oregon about the tenth of that month—the date of the $10,000 check—and therefore these two checks must have been drawn and paid before he went to San Francisco. There is, then, no probable ground on which it can be claimed that the money received on them was lost in the wreck of the Brother Jonathan, unless it is assumed that he took it with him to San Francisco, which is possible; but in that case the money would be at his risk, and if lost chargeable to him.

But admitting that this $3,000 came to Logan's hands by the transfer of the checks to a third person before he went to San Francisco, and that it was not lost at sea, it does not follow that it was not disbursed according to law.

The annual appropriations for the Indians of middle Oregon at the Warm Spring agency for special objects, in pursuance of articles 2, 3, and 4 of the treaty aforesaid, (12 St. 964,) was $17,600, or $4,400 a quarter, of which the $5,781.01 reported by Logan as on hand on March 31, 1865, did not include more than $1,690.37, and $3,000 added to this would make but little more than was required to be expended under those heads during the quarter ending June 30, 1865. But the agency was actually conducted four months upon these sums of $5,781.01, the balance on hand at the beginning of the second quarter of 1865, and the $3,000 supposed to have been received on the superintendent's checks in May of that year. But, under the circumstances, it is possible that some portion of this money remained unexpended at his death, and may have been lost with him or misappropriated by some one or in some way. But the probability is that the amount was duly disbursed in the business of the agency, unless some portion of it was lost on the Brother Jonathan, and that by far the greater portion of it was so disbursed I think there is no doubt. But to get the legal evidence of this fact and produce it in court at this late day would be very difficult, if not

impossible, and cost the defendant more than the amount of any probable deficiency.

Under the circumstances, it is much more just and reasonable that the plaintiff should be denied a new trial, rather than that the defendant should incur the risk of having a judgment rendered against her for $7,000 or $8,000, because by the death of Logan and the inexcusable delay of the former, it is no longer possible to make legal proof of the facts and circumstances as they actually transpired.

Another reason against allowing this motion, under the circumstances, is this: These bonds having been taken upon a larger condition than the law requires, to-wit, that the principal would account for *all* money and property which came into his hands, whether as Indian agent or otherwise,—and, as alleged on the absolute demand of the commissioner of Indian affairs,—it is doubtful, under the authorities cited and commented on in the opinion herein of December 15, 1879, (*U. S.* v. *Tingey*, 5 Pet. 115; *Hawes* v. *Marchant*, 1 Cur. 140,) if they are legal. In my own judgment, they ought to be held valid, in any event, as to money and property received by the principal under them, as Indian agent, but no further. *U. S.* v. *Bradly*, 10 Pet. 343.

The motion for a new trial is denied, and the defendant must have judgment that she go hence without day.