### McCULLOUGH et al. v. SMITH.*

(Circuit Court of Appeals, Eighth Circuit. June 20, 1917.)

#### No. 4784.

1. TERRITORIES ⬡18—INDIAN TERRITORY—ADOPTION OF ARKANSAS STATUTES.
   By Act May 2, 1890. c. 182, § 31, 26 Stat. 94, extending certain of the statutes contained in Mansf. Ark. Dig. over the Indian Territory, Congress adopted the construction placed upon such statutes by previous decisions of the Supreme Court of Arkansas, but not by subsequent decisions, nor the decisions of that court construing and applying the common law.

2. MORTGAGES ⬡188—CONSTRUCTION AND EFFECT—LAW OF INDIAN TERRITORY.
   The legal effect of a mortgage executed in 1906 on land in Indian Territory is to be determined by the common law, there being no provision on the subject in the Arkansas statutes extended by Congress over the territory; and under the common law the mortgage is not a complete alienation of the title, but, except as against the mortgagee, the mortgagor, while in possession and where there has been no foreclosure, remains the real owner of the land.

3. INDIANS ⬡16(4)—VALIDITY OF LEASE—EFFECT OF INVALID PROVISION—DIVISIBILITY.
   Act June 7, 1897, c. 3, 30 Stat. 72, authorized allottees of land within the limits of the Quapaw Agency, Indian Territory, to lease their land "for a term not exceeding * * * ten years for mining or business purposes." An allottee subject to such act executed an oil and mining lease for ten years, with a further provision that, should oil or other mineral of value be found in paying quantities, the privilege of operating should continue so long as such substances could be produced in paying quantities, "on such terms and conditions as parties hereto have agreed upon after the expiration of this lease." Held, that the lease was divisible, and that the invalidity of the provision for an extension did not affect its validity for the ten-year term which was within the statute.

4. CONTRACTS ⬡137(1)—SEVERABLE CONTRACTS—EFFECT OF INVALID PROVISION.
   When a part of a divisible grant or contract is ultra vires or illegal, but not malum in se, and the remainder is lawful, the latter may be sustained

---

⬡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
* Rehearing denied September 10, 1917.

and enforced, unless it appears from a consideration of the whole grant or contract that it would not have been made without the part which is ultra vires or illegal.

5. MINES AND MINERALS ☞58—MINING LEASE—VALIDITY.

In a suit by the holders of a mining lease to quiet title as against adverse claimants, it appeared that the lease was for the term of ten years, "for the purpose of prospecting, mining, drilling, boring, or digging for oil, gas, asphaltum, lead, zinc, coal, and copper. * * *" It also gave the lessee the right to use the surface for railroad tracks, pipe lines, or buildings. The bill alleged that the lessee and his assigns had been in possession since the execution of the lease, and had drilled test holes and sunk a shaft thereon, and improved the same for mining purposes. *Held*, that such lease was not subject to the rules governing strictly oil and gas leases, and that it was not invalid on its face by a clause providing that the lessee should pay five cents per acre yearly in case of delay in beginning operations, "in lieu of said work, so long as they or their assigns desire to operate or hold the same," but that the question whether such clause was unfair or inequitable was one to be determined on final hearing.

Appeal from the District Court of the United States for the Eastern District of Oklahoma; Ralph E. Campbell, Judge.

Suit in equity by W. P. McCullough and another against W. M. Smith. From a decree dismissing the bill on motion, complainants appeal. Reversed.

Paul A. Ewert, of Joplin, Mo. (A. C. Towne, of Miami, Okl., on the brief), for appellants.

A. Scott Thompson, of Miami, Okl. (Hiram W. Currey, of Joplin, Mo., on the brief), for appellee.

Before SANBORN and SMITH, Circuit Judges, and AMIDON, District Judge.

SMITH, Circuit Judge. According to the allegations of the bill, the plaintiffs W. P. McCullough and T. F. Phillips, residents and citizens of Oklahoma, and D. E. Beth, a citizen and resident of Kansas, brought this suit in equity against W. M. Smith, a citizen and resident of Kansas. The bill substantially alleges that on March 2, 1895, c. 188, Congress enacted 28 Stat. 876, 907, as follows:

"That the allotments of land made to the Quapaw Indians, in the Indian Territory, in pursuance of an act of the Quapaw National Council, approved March twenty-third, eighteen hundred and ninety-three, be and the same are hereby ratified and confirmed, subject to revision, correction and approval by the Secretary of the Interior: Provided, however, that any allottee who may be dissatisfied with his allotment shall have all the rights to contest the same provided for in said act of the Quapaw National Council subject to revision, correction, and approval by the Secretary of the Interior. And the Secretary of the Interior is hereby authorized to issue patents to said allottees in accordance therewith: Provided, that said allotments shall be inalienable for a period of twenty-five years from and after the date of said patents." See Goodrum v. Buffalo, 162 Fed. 817, 89 C. C. A. 525.

There was patented to Leander J. Fish some 200 and possibly 240 acres of land. On June 21, 1906, c. 3504, the Fifty-Ninth Congress (34 Stat. 325, 344) enacted the following:

"That Leander J. Fish, an allottee of two hundred acres of land in section thirty-two, township twenty-nine, range twenty-three east, and of forty acres

in section fourteen, township twenty-nine, range twenty-four east, in the Quapaw Reservation, under the provisions of the act of March second, eighteen hundred and ninety-five (twenty-eighth Statutes, page nine hundred and seven), and the act of March third, nineteen hundred and one (thirty-first Statutes, page ten hundred and fifty-eight), be, and he is hereby, authorized to alienate such portion of said land as he may see fit, not exceeding one hundred and twenty acres, under such rules and regulations as the Secretary of the Interior may prescribe, and any conveyance of such land made by said Fish shall be executed subject to the approval of the Secretary of the Interior."

Thereafter, on July 14, 1906, Fish executed a mortgage deed to E. V. Kellett upon the east half of the northwest quarter, and the southwest quarter of the northeast quarter, section 32, township 29, range 23, being 120 acres, to secure a note for $1,000 due in three years, with 9 per cent. interest. This mortgage deed was received by the Secretary of the Interior, and approved July 20, 1906, although for aught that appears he had never prescribed any rules or regulations as contemplated in the last-quoted act of Congress. Thereafter Kellett assigned the said mortgage deed to the Alliance Trust Company of Dundee, Scotland. On June 20, 1908, the Alliance Trust Company acknowledged full payment and satisfaction of said mortgage, and released the same, and reconveyed the premises to Leander J. Fish, his heirs and assigns. On June 7, 1897, c. 3, Congress passed an act (30 Stat. 62, 72):

"That the allottees of land within the limits of the Quapaw Agency, Indian Territory, are hereby authorized to lease their lands, or any part thereof, for a term not exceeding three years, for farming or grazing purposes, or ten years for mining or business purposes."

On April 29, 1912, Leander J. Fish executed a lease of the same 120 acres previously mortgaged to Kellett to Dallas Hopper for the term of ten years,

"for the purpose of prospecting, mining, drilling, boring, or digging for oil, gas, asphaltum, lead, zinc, coal and copper and all and every other kind or kinds of valuable minerals, ore, fossil, or vegetable substance whatever; * * * if oil, mineral or any other substances of value are found in paying quantities in any well drilled or shaft sunk, the privilege of operating shall continue so long as oil, minerals or other substances of value can be produced in paying quantities on such terms and conditions as parties hereto have herein agreed upon after expiration of this lease. * * * The party of the second part hereby agrees to begin operations on the above-described premises within ninty days after the date of this lease; in case such operations do not begin within said stated time, said second party agrees to pay to said first party 5¢ per acre yearly for each and every acre contained in this lease, in lieu of said work, so long as they or their assigns desire to operate or hold the same."

Immediately after the execution of said lease said Dallas Hopper entered into possession of said premises under its terms, and thereafter sold and conveyed all his rights under said lease to the plaintiffs, and ever since the date of said lease said Hopper and his assignees, the plaintiffs, have remained in possession of the leased premises under said lease, and have prospected and developed said lands, and have sunk numerous test or drill holes upon said land, and have sunk a shaft thereon, and have improved and developed the same for mining purposes. The plaintiffs claim a leasehold interest in said premises under

said mining lease, and defendant claims an estate and interest adverse to the plaintiffs; that the claim of defendant is without any right whatever, and the said defendant has no estate, title, or interest whatever in said premises or any part thereof. The bill prays that the plaintiffs' title to their claimed leasehold interest be quieted; that it be decreed the defendant has no right whatever in said land, and that he be debarred from asserting any claim adverse to the plaintiffs', and that defendant's claim under his mining lease be decreed void, and for general equitable relief. The defendant filed a motion to dismiss the bill because of want of equity, and this motion was sustained, and the plaintiffs appeal.

. It was not claimed in the motion to dismiss that the court lacked jurisdiction. For the first time it is urged in this court that the case should have been dismissed for that reason. It is probable that the jurisdiction could not be sustained upon the ground of diversity of citizenship, as it is alleged that the plaintff, D. E. Beth, is a citizen and resident of the state of Kansas, and that the defendant, W. M. Smith, is a citizen and resident of the same state. But it will hereafter appear that this case "arises under the  *  *  *  laws of the United States," within the meaning of Judicial Code, § 24, sub. 1 (Act March 3, 1911, c. 231, 36 Stat. 1091, as amended U. S. Comp. St. 1916, § 991), and the objection to the jurisdiction cannot be sustained.

Plaintiffs contend that the conveyance to Kellett was such an exhaustion of the power of alienation under the act of the 59th Congress (34 Stat. 344) that all control over alienation of the lands in question under the act of the 53d Congress (28 Stat. 907), and under the act of the 55th Congress (30 Stat. 72), had ceased to exist when the lease was given by Fish, and that it was given not under the power conferred by the 59th Congress (34 Stat. 344), but absolved from any and all restrictions whatever. This involves a construction of the act of Congress of May 2, 1890, c. 182, 26 Stat. 81, 94, § 31, and the 14th section of the act of June 28, 1898, c. 517, 30 Stat. 495, 500.

[1] In 1884 there was adopted, by the general Assembly of Arkansas, Mansfield's Digest of the statutes of that state down to the close of the General Assembly of 1883. By section 31 of the statute of May 2, 1890 (26 Stat. 81, 94), Congress extended certain of these general laws over Indian Territory. It is noticeable that of the 156 chapters of Mansfield's Digest, less than one-third in number are covered by this act. It doubtless adopted the interpretation and construction put upon the statutes thus put in force in the Indian Territory by the Supreme Court of Arkansas prior to the adoption of the act of Congress, but not those decisions subsequent thereto.

In McClellan v. Pyeatt, 50 Fed. 686, 1 C. C. A. 613, this court held that although 26 Stat. 81, 94, put in force in Indian Territory the practice act of the state of Arkansas, and although ever since 1840 the Supreme Court of Arkansas had held that a motion for a new trial in the trial court to correct all of its alleged errors not apparent upon the face of the record was essential to review, this had no application in this court in appellate proceedings from the United States court of Indian Territory.

In Eddy v. Lafayette, 49 Fed. 798, 1 C. C. A. 432, this court held that where a statute of Arkansas had been construed by the Supreme Court of that state so as to change the burden of proof as to negligence from plaintiff to defendant in an action against a railroad company for killing stock, that as the statute was not extended to Indian Territory by the act of 26 Stat. 81, 94, the rule in the courts of Indian Territory had not been changed.

In Sanger v. Flow, 48 Fed. 152, 1 C. C. A. 56, and in Leak Glove Manufacturing Co. v. Needles, 69 Fed. 68, 16 C. C. A. 132, this court held that Congress was presumed to have put in force the laws of Arkansas enumerated in Indian Territory, with the interpretation and construction put upon said laws prior to the act of Congress by the Supreme Court of Arkansas.

In Noyes v. Neel, 100 Fed. 555, 40 C. C. A. 539, this court held that a construction by the Supreme Court of Arkansas put upon one of the statutes extended to Indian Territory after such extension was merely persuasive, and did not preclude the courts of Indian Territory from expressing their independent opinion on the question of its interpretation and construction.

Enough has been said to show that Congress did not adopt for Indian Territory the interpretation and construction of Arkansas as to the common law. It simply extended the statutes enumerated to Indian Territory with the interpretation and construction placed upon them by the Supreme Court of the state of Arkansas before the date of the act of Congress.

[2] The 14th section of the act of June 28, 1898, c. 517 (30 Stat. 495, 500), provides:

"For the purposes of this section all of the laws of said state of Arkansas herein referred to, so far as applicable, are hereby put in force in said territory."

Without stopping to analyze what laws of Arkansas are within "the purposes of this section," as used in the statute of June 28, 1898 (30 Stat. 495, 500), it is sufficient to say that the decisions of the Supreme Court of Arkansas are not themselves laws within the meaning of this section. Swift v. Tyson, 16 Peters, 1, 17, 10 L. Ed. 865.

As the Kellett mortgage was given July 14, 1906, before the actual admission of Oklahoma to the Union, the effect of that instrument must be determined by the common law, modified, if at all, by the laws of Arkansas made applicable by the act of Congress indicated to the Indian Territory and the interpretation and construction of such laws by the Supreme Court of Arkansas prior to May 2, 1890. Pyeatt v. Powell, 51 Fed. 551, 2 C. C. A. 367.

Among the laws of Arkansas put in force by the act of May 2, 1890, was chapter 110 of Mansfield's Digest. Section 4743 of this chapter provides that a mortgage shall be a lien on the mortgaged property from the time of the filing of the mortgage. Section 4745 provides that upon payment of a mortgage the mortgagee or his assignee shall, upon request of the person making payment, acknowledge satisfaction upon the margin of the record of the mortgage. Section 4746 provides that if he fails to so acknowledge satisfaction

as provided in the previous section within 60 days after being requested to do so, he will be liable in damages. Section 4747 provides that such acknowledgment of satisfaction shall have the effect to release the mortgage and revest in the mortgagor or his legal representative all title to the mortgaged property. Section 4748 provides that if mortgaged property be redeemed by a payment to the officer, such officer shall execute and acknowledge a certificate thereof, and the same shall be recorded and have the same effect as the satisfaction on the margin of the record provided in section 4747. Section 4759 provides that the property shall not at the first offering be sold for less than two-thirds of the appraised price, and the second offering shall be made 12 months after the first, and that real property may be redeemed within one year from the date of sale.

There is not a word in the chapter or in Mansfield's Digest, so far as we have been able to ascertain, as to whether the whole estate, legal and equitable, vests under a mortgage in the mortgagee. Everything in Arkansas which passes upon how far the mortgagor alienates and how far the mortgagee acquires title is simply the construction of the common law by the Supreme Court of that state. Whittington v. Flint, 43 Ark. 504, 51 Am. Rep. 572; Fitzgerald v. Beebe, 7 Ark. 310; Kannady v. McCarron, 18 Ark. 166; Gilchrist v. Patterson, 18 Ark. 575; Terry v. Rosell, 32 Ark. 478; Reynolds v. Canal Co., 30 Ark. 520.

In none of these cases does the Supreme Court of Arkansas refer to or cite as the basis of the opinion any of the statutes extended over Indian Territory by act of Congress. They are simply decisions of the Supreme Court of Arkansas as to what it deemed the common law to be, and such constructions were never adopted by Congress for Indian Territory. We say this because it is true, and not because it is essential to the determination of this case; for the Supreme Court of Arkansas has decided numerous cases showing that a legal and equitable interest remains in the mortgagor in addition to those specified in Mansfield's Digest. In one of those cases (Terry v. Rosell, 32 Ark. 478, 488) Vaughan had mortgaged certain real estate to Terry, and the court said:

"The question now presents itself, how the rights of the parties are affected by these conveyances? As between Vaughan and Terry, the legal estate is considered to be in Terry, as between him and Vaughan, and those claiming under Vaughan; but as to all others Vaughan must be considered as seised of the legal estate, and might well convey to another subject to the mortgage. Waterman's Eden., p. 93."

In Turner v. Watkins, 31 Ark. 429, it was held that, when a mortgage or trust deed has a defeasance clause, the legal title is with the grantee, and the equity of redemption is in the grantor, subject to sale on execution.

In Burr v. Robinson, 25 Ark. 277, it is held that the mortgagor of real property has the ownership or fee, and his wife is entitled to dower therein, and the mortgagee of real property, even after forfeiture, has no interest in the property subject to execution, and the last proposition was sustained in Trapnall's Adm'x v. The State Bank, 18 Ark. 53, and the cases cited therein.

In Van Ness v. Hyatt, 13 Pet. 294, 297, 10 L. Ed. 168, it is said:

"In the United States, different views have been taken on this question in the courts of the several states. It is said in 4 Kent's Com. 153–4, that courts of law have, by a gradual and almost insensible progress, adopted the views of a court of equity on the subject of mortgages, which are founded in justice, and accord with the true intent and inherent nature of the transaction; that, except as against the mortgagee, the mortgagor, while in possession, and before foreclosure, is regarded as the real owner."

We hold that the question of the effect of the Kellett mortgage is to be determined by the common law of England and America as developed from time to time unaided by statute, and that everywhere, except as between the mortgagor and the mortgagee, the mortgagor, while in possession and before foreclosure, is regarded as the real owner; and we also hold that, even if the decisions of Arkansas were controlling, the Kellett mortgage was not a complete alienation of the land; that the confirmation by the Secretary of the Interior of a partial alienation would not cause him to lose authority over the complete alienation. Of course, if this mortgage had gone to foreclosure, it would have ultimately resulted in a complete alienation, and in this contingent way the Secretary of the Interior approved a complete alienation if it took place; but it did not take place, and Fish had no more authority to execute a lease by reason of the execution and approval of this mortgage than he would have had if it had never been executed.

[3] We turn now to the question of the validity of the lease now owned by the plaintiff, but originally executed to Dallas Hopper.

The defendant contends that it is invalid for two reasons: First, the lease provides that if oil, mineral, or any other substances of value are found in paying quantities in any well drilled or shaft sunk the privilege of operating shall continue so long as oil, minerals, or other substances of value can be produced in paying quantities, on such terms and conditions as parties hereto have herein agreed upon after expiration of this lease; that the act of 55th Congress (30 Stat. 72) only authorized leases for mining purposes for a term not exceeding ten years, whereas the clause above quoted made the lease in effect in perpetuity. Second, that the lease contained the following provision:

"The party of the second part hereby agrees to begin operations on the above-described premises within ninety days after the date of this lease; in case such operations do not begin within said stated time, said second party agrees to pay to said first party 5¢ per acre yearly for each and every acre contained in this lease, in lieu of said work, so long as they or their assigns desire to operate and hold the same,"

—the specific contention under this head being that the lease lacks mutuality and is in effect a unilateral contract. Defendant cites in support of this contention Superior Oil & Gas Co. v. Mehlin, 25 Okl. 809, 108 Pac. 545, 138 Am. St. Rep. 942; Huggins et al. v. Daley, 99 Fed. 606, 40 C. C. A. 12, 48 L. R. A. 320, and Reese v. Zinn (C. C.) 103 Fed. 97.

These questions will be passed upon in their order.

By the act of June 7, 1897 (30 Stat. 62, 72), the Indian in this case was authorized to lease this land "for a term not exceeding

* * * ten years for mining or business purposes." The Hopper lease granted the land for purposes of prospecting, mining, drilling, boring, or digging for oil, gas, asphaltum, lead, zinc, coal, and copper, and all and every other kind or kinds of valuable minerals, ore, fossils, and vegetable substance whatever, for ten years, with the additional provision that if oil, mineral, or any other substances of value -are found in paying quantities in any well drilled or shaft sunk, the privilege of operating shall continue so long as oil, minerals, or other substances of value can be produced in paying quantities, on such terms and conditions as parties hereto have herein agreed upon after expiration of this lease.

The first question is whether this last provision made the lease in effect in perpetuity, and whether it made the lease void from the beginning or valid for ten years and void thereafter.

Turning first and primarily to the federal authorities upon the subject, in United States v. Bradley, 10 Pet. 343, 9 L. Ed. 448, a suit was brought by the United States on a joint and several bond, and it was claimed the bond contained conditions not authorized by statute. The court said, at page 360:

"That bonds and other deeds may, in many cases, be good in part, and void for the residue, where the residue is founded on illegality, but not malum in se, is a doctrine well founded in the common law, and has been recognized from a very early period."

After a review of a number of authorities, English and American, it continued, 10 Pet. on page 363 (9 L. Ed. 448):

"Upon the whole, upon this point we are of opinion that there is no solid distinction in cases of this sort between bonds and other deeds containing conditions, covenants, or grants not malum in se, but illegal at the common law, and those containing conditions, covenants, or grants illegal by the express prohibition of statutes. In each case the bonds or other deeds are void as to such conditions, covenants, or grants which are illegal, and are good as to all others which are legal and unexceptionable in their purport. The only exception is when the statute has not confined its prohibitions to the illegal conditions, covenants, or grants, but has expressly, or by necessary implication, avoided the whole instrument to all intents and purposes."

In Gelpcke v. City of Dubuque, 1 Wall. 175, 222, 17 L. Ed. 520, the Supreme Court said:

"The counsel of the plaintiffs in error have submitted no argument in regard to the two first causes assigned for the demurrer. We have not therefore considered the questions which they present. They relate to certain provisions of the contract which are claimed to be invalid. Conceding this to be so, they are clearly separable and severable from the other parts which are relied upon. The rule in such cases, where there is no imputation of malum in se, is that the bad parts do not affect the good. The valid may be enforced."

In United States v. Hodson, 10 Wall. 395, 408, 19 L. Ed. 937, it is said:

"It is a settled principle of law that where a bond contains conditions some of which are legal and others illegal, and they are severable and separable, the latter may be disregarded and the former enforced."

In Oregon Steam Navigation Co. v. Winsor, 20 Wall. 64, 22 L. Ed. 315, where the Oregon Steam Navigation Company sold a steamer to

one Winsor with a stipulation that she should not be run on the waters of the state of California for the period of ten years from the 1st day of May, 1867, and this was a reasonable stipulation in restraint of trade for seven years but not for ten, the court held that the contract was separable, and that an action would lie for liquidated damages for the violation of the contract within the seven years.

In Bernhisel v. Firman, 22 Wall. 170, 22 L. Ed. 766, where notes had been given in renewal of old notes, computing the interest at the rate fixed in the old notes, which was in excess of the customary rate, and it had been held that such higher rate was valid until the maturity of the notes, and thereafter the customary or statutory rate governed, it was held that in suits upon the renewal notes independently of the bankrupt act and of any statute making such security void in toto as usurious, they were valid securities for the amount which would be due on a calculation properly made. They were bad only for the excess above proper interest.

In McCullough v. Virginia, 172 U. S. 102, 19 Sup. Ct. 134, 43 L. Ed. 382, the Supreme Court, after citing numerous state authorities and the authorities from that court heretofore cited, said:

"We see no reason to change the views heretofore and often expressed by this court, and reiterate, as said in Vashou v. Greenhow, 135 U. S. 668, 10 Sup. Ct. 972, 34 L. Ed. 304, 'This question, therefore, must be considered as foreclosed, and no longer open for consideration.'"

Turning now to the decisions of this court in Illinois Trust & Savings Bank v. City of Arkansas City, 76 Fed. 271, 22 C. C. A. 171, 34 L. R. A. 518, the city of Arkansas City, in the state of Kansas, had granted to the Interstate Gas Company the franchise to construct and operate waterworks in the city exclusive in character, and stipulated for the payment of specific sums as hydrant rentals. The provision granting the exclusive franchise was void, but this court held that the city was liable for the water rentals under the contract.

In Lincoln Savings Bank & Safe Deposit Co. v. Allen, 82 Fed. 148, 27 C. C. A. 87, this court held that where the plaintiff in error had a claim for $2,700 against one Sears secured by collateral, and it contracted that upon payment to it of $1,500 and the transfer to it absolutely of two of the collateral notes it would release all claims against Sears and surrender the balance of the collateral notes, that while the agreement to release Sears was illegal the contract to surrender the remaining collateral notes was valid and could be enforced. See Kauffman v. Raeder, 108 Fed. 171, 179, 47 C. C. A. 278, 54 L. R. A. 247.

In McPhee & McGinnity Co. v. Union Pacific R. Co., et al., 158 Fed. 5, 87 C. C. A. 619, the city of Denver by ordinance had granted to the Union Pacific Railway Company, its successors and assigns, a license to construct a railroad track on Blake street, in the city of Denver. The city council had no power to grant anything but a revocable license, and it was insisted that every license must be personal and unassignable, and as the license in question ran not only to the railroad company, but to its successors and assigns, it was unauthorized and void. This court held that the city council had power to grant this

license to the Union Pacific Railroad Company, and if without authority it conferred it upon its successors and assigns the result would be that the latter portion of the grant would fail and the former stand.

In Jenson v. Toltec Ranch Co., 174 Fed. 86, 98 C. C. A. 60, it is held that it is no defense to an action upon a contract executed by the promisee that a divisible part of its consideration was without the powers of the promisor corporation if the other part was valuable, legal, and within them; for the promisee may waive the part without the powers of the promisor and recover upon the consideration within its powers.

Passing now from the decisions of the Supreme and of this court to decisions of other federal courts, in Western Union Telegraph Co. v. Kansas Pac. Ry. Co. (D. C.) 4 Fed. 284, the principle that a provision in a contract which is illegal does not invalidate the entire contract is announced.

In Re T. H. Bunch Co. (D. C.) 180 Fed. 519, the opinion of Trieber, District Judge, quite clearly makes the distinction heretofore pointed out.

In McBride v. Farrington, 149 Fed. 114, 115, 79 C. C. A. 56, 57, the court said:

"The leases in question are for the mining of coal, iron, petroleum, oil, gas, asphaltum, and other minerals. If void as to the other minerals, they are apparently valid as to the coal. For what length of time they purported to run is not shown by the record. If for an indefinite time the terms of the act would no doubt restrict them to ten years. It is difficult to see how such leases, which apparently conveyed some rights for a restricted period, can be held to be so utterly valueless as to constitute an entire failure of consideration."

And in the dissenting opinion it is said:

"It is well settled that when a conveyance or contract contains conditions, some of which are legal and others illegal, and they are severable and separable as respects consideration and performance, the latter may be disregarded and the former enforced."

The following federal cases sustain the same doctrine: Van Ness v. Hyatt, 5 Cranch, C. C. 127, 28 Fed. Cas. 1044; Warner v. Howell 3 Wash. C. C. 12, 29 Fed. Cas. 257; United States v. Humason (C. C.) 8 Fed. 71, 79; United States v. Jones (C. C.) 77 Fed. 717, 721; Mathews Slate Co. v. New Empire Slate Co. (C. C.) 122 Fed. 972; In re Johnson (D. C.) 224 Fed. 180, 186; Northern Pac. R. Co. v. United States, 15 Ct. Cls. 428.

Passing now from the federal cases, a very strong case on the subject, reviewing many cases both English and American, is Osgood v. Central Vermont Railroad Co., 77 Vt. 334, 60 Atl. 137, 70 L. R. A. 930, 933, and see Shaw v. Carpenter, 54 Vt. 155, 41 Am. Rep. 837.

The following cases quite fully sustain the proposition that the clause in the lease in question was void but did not affect the balance of the lease: Hart v. Hart, 22 Barb. (N. Y.) 606; Robertson v. Hayes, 83 Ala. 290, 3 South. 674; Erie Railway Co. v. Union Locomotive &

Exp. Co., 35 N. J. Law, 240; Glaze v. Duson, 40 La. Ann. 692, 4 South. 861; Porter v. Fisher, 4 Cal. Unrep. Cas. 324, 34 Pac. 70; Mack v. Jastro, 126 Cal. 130, 58 Pac. 372; Hedges v. Frink (Cal.) 163 Pac. 884; Corcoran v. Lehigh & Franklin Coal Co., 138 Ill. 390, 28 N. E. 759; Stewart v. Pierce, 116 Iowa, 733, 89 N. W. 234; Weitzner v. Thingstad, 55 Minn. 244, 56 N. W. 817; Rosenblatt v. Townsley, 73 Mo. 536; Morris v. Way, 16 Ohio, 469; Minnesota Sandstone Co. v. Clark, 35 Wash. 466, 77 Pac. 803.

Other cases in point could be cited, but we have called attention to enough to fully demonstrate, as we think, that the clause in the lease in question was invalid, but it did not serve to invalidate the lease as a whole.

[4] The rule is that when a part of a divisible grant or contract is ultra vires or illegal, but not malum in se, and the remainder is lawful, the latter may be sustained and enforced unless it appears from a consideration of the whole grant or contract that it would not have been made without the part which is ultra vires or illegal. Illinois Trust & Savings Bank v. City of Arkansas City, 76 Fed. 271, 280, 22 C. C. A. 171, 34 L. R. A. 518; McPhee & McGinnity Co. v. Union Pac. Ry. Co., 158 Fed. 5, 19, 87 C. C. A. 619.

This lease is divisible, and it does not appear that it would not have been made without the clause assailed.

[5] We turn now to the second clause in the lease which it is claimed invalidated it. This question does not seem to have been presented to the court below at all. It was never presented in this court in the original printed brief. It was first suggested in the oral argument at the bar. Were it suggested in this case to reverse the judgment of the court below we should not consider it at all, but it is suggested as a ground upon which the action of the court below should be sustained, and we have concluded that it was best to consider it briefly.

The lease in question expressly recites that it is in consideration of one dollar in hand paid by the lessee to the lessor and other considerations. It has been held not only that one dollar is a valuable consideration, but that neither party to such a contract can show that the same was not paid. Stannard v. Aurora E. & C. Ry. Co., 220 Ill. 469, 77 N. E. 254; Lindley v. Raydure (D. C.) 239 Fed. 928, 938.

In Lovett v. Eastern Oil Co., 68 W. Va. 667, 70 S. E. 707, Ann. Cas. 1912B, 360, 363, the lease was not only for oil and gas, but "for the purpose of prospecting, mining, drilling, boring, or digging for oil, gas, asphaltum, lead, zinc, coal, and copper, and all and every other kinds of valuable minerals, ore, fossils, or vegetable substances whatever." The particular clause here in question provides that it shall run "so long as they [the party of the first part] and their assigns desire to operate or hold the same." This, we think, means within the period of the lease, which we have held was for ten years. Under the holding just made with reference to the other clause, if it extended beyond ten years it would, in that respect, be void, but the balance of the lease would stand.

243 F.—53

We have seen that the petition expressly alleges that the lessee and his assigns, including these plaintiffs, have remained in continuous possession of the said premises; that, under and pursuant to the terms of said lease, they have prospected and developed said land and sunk numerous test or drill holes upon said land, and have sunk a shaft thereon, and improved and developed the same for mining purposes. It must be borne in mind that the lease was for the purpose of mining lead, zinc, coal, and copper as well as for the purpose of boring for oil and gas. The rules, therefore, as to oil and gas, which are fugacious (Priddy v. Thompson, 204 Fed. 955, 123 C. C. A. 277, Kemmerer v. Midland Oil & Drilling Co., 229 Fed. 872, 144 C. C. A. 154), do not wholly control the construction of the contract.

The lease gave not only the right to mine for lead, zinc, coal, and copper, but it gave the right—

"to use as much of the surface of said land and so much of the building stone found thereon as may be properly needed to successfully conduct said prospecting and mining operations, also the right of way over and across said land whereon to construct and operate such line or lines of railroad as may be necessary to carry on and prosecute the objects of this indenture; also the right to erect buildings, refineries, machinery, pipe lines upon said premises for successfully carrying on the business of boring, prospecting, mining, and prosecuting the object of this indenture, with the right to remove or sell and remove all of said buildings. refineries, machinery and pipe lines, at any time or at the expiration of this lease."

The rule, therefore, that the lessee who has the right to oil and gas acquires only an incorporeal hereditament is not applicable to this lease as applied to other subjects of the lease. Allegheny Oil Co. v. Snyder, 106 Fed. 764, 45 C. C. A. 604; Lindley v. Raydure (D. C.) 239 Fed. 928.

The question whether the clause now under consideration is unfair or inequitable must be determined upon the final hearing upon the issues between the parties. Suffice it to say, it does not appear that there is anything in the clause in question to invalidate the lease. Guffey v. Smith, 237 U. S. 101, 116, 117, 35 Sup. Ct. 526, 59 L. Ed. 856; Brewster v. Lanyon Zinc Co., 140 Fed. 801, 72 C. C. A. 213.

The cases cited by appellee upon this question are not in point. In Superior Oil & Gas Co. v. Mehlin, 25 Okl. 809, 108 Pac. 545, 138 Am. St. Rep. 942, the defendant made not a lease but a contract to make a lease to plaintiff of certain lands for oil and gas. The action was to reform and secure specific performance of the lease. The contract sued on was wholly executory. In this case the bill shows the lease in suit was in part executed, and is not a suit for specific performance, but is in the nature of an action to quiet title. The holding in that case was that specific performance will not lie unless the agreement is certain, fair, and just in all its parts, and such an action may, where showing that the contract is unfair, unjust, and against good conscience, well justify the court in refusing such decree, although the contract, had it been executed, might offer no sufficient ground for cancellation. It was further held that an executory contract which under its terms leaves it optional with one party whether or not he will

proceed with the contemplated enterprise makes the same likewise optional with the other, and specific performance will not be decreed. It is manifest that case does not sustain the contention of the appellee.

In Huggins v. Daley, 99 Fed. 606, 40 C. C. A. 12, 48 L. R. A. 320, it is held that where an oil and gas lease provides for the compensation of the lessor solely by a share of the product, and provides for the sinking of a well within a specified time under a penalty as distinguished from liquidated damages, and the lessee makes no attempt to comply with the terms of his contract, and manifests no intention to comply therewith, the lease becomes forfeitable at the expiration of the specified time. In this case the defendant had filed no answer, and did not allege that the lease had been forfeited. This case under the present state of the pleadings has no application.

The same is true of Reese v. Zinn (C. C.) 103 Fed. 97. It was an action to forfeit a lease upon the ground of abandonment, and did hold that the lease lacked mutuality because it authorized the lessee to terminate the contract at will.

The decree of the District Court is reversed, and the cause is ordered remanded, to the end that the court may overrule the motion to dismiss the petition and permit the defendant, if so advised, to answer and proceed to trial.