WESTERN UNION TELEGRAPH CO. v. KANSAS PACIFIC RAILWAY CO. and others.

(*District Court, D. Colorado.* ——, 1880.)

1. RAILROAD—TELEGRAPH FRANCHISE—CONTRACT.—A railroad, authorized and required by the act of its organization to construct a telegraph line, entered into a contract with a telegraph company for the construction of such line. *Held*, such contract could not be avoided by the railroad company, either as a usurpation of its function or for want of capacity to make it.

2. SAME—SAME—SAME—ILLEGAL CLAUSE.—A clause of such contract contained an agreement, upon the part of the railroad company, not to transport men or materials for any other telegraph company at less than the regular rates for passengers and freight, and not to give permission to any such company to erect another line on its lands or roadway. *Held* that, if such clause was void, as in conflict with the act of 1866, aiding the construction of telegraph lines, it could be eliminated from the contract.

3. SAME—SAME—SAME—OFFICERS—RESCISSION.—Such contract also provided for the transmission without charge, by the telegraph company, of the *family, private, and social messages of the executive officers* of the railroad. *Held* that, as such free use of the telegraph was not limited to the officers who made the contract, it could be rescinded after the expiration of 13 years.

4. SAME — SAME—SAME — RESCISSION —APPROPRIATION.—*Held, further,* however, that such rescission would not authorize either party to appropriate to its own use the joint property of both, acquired under the contract, without paying for the same.

————, for plaintiff.

————, for defendants.

HALLETT, D. J.   On the first day of October, A. D. 1876, the Union Pacific Railway Company, eastern division, afterwards known as the Kansas Pacific Railway Company, entered into a contract with the Western Union Telegraph Company relating to the construction and use of a line of telegraph on and along the road of the first-named company. This contract was to continue 25 years.   The railway company agreed to pay to the telegraph company the cost of poles, wire, and insulators which had been erected on the line of the road between Wyandotte and Fort Riley, Kansas, and thereafter to furnish material for extending the line as the road should be built westward.   The railway company was to furnish the materials and transportation for the line, and the telegraph company was to construct it and keep it in repair.   The telegraph company was also to furnish main batteries for operating the line; and, until a second wire should be extended, both companies were to use the first in common.   After another wire should be put up by the telegraph company, the first was to remain for the exclusive use of the railway company, and thereafter either company could have wires for its own use, as its business should require, by paying the cost thereof.   With this arrangement as to building, maintaining, and operating the line, the railway company was to have free use thereof for its own business, and the telegraph company to use and operate it for business in general, from which a profit might be derived.   Each party fulfilled the contract until the line was built to Denver; and

thereafter they continued in the use and enjoyment of it until on or about the twenty-seventh day of February last, when the officers of the railway company took possession of the telegraph, and have excluded the telegraph company therefrom ever since that time. To prevent such action the telegraph company filed, in the district court of Arapahoe county, the original bill in this cause against the Kansas Pacific Railway Company and the American Union Telegraph Company, and, on the twenty-sixth of February last, obtained from the judge of that court an order restraining the Kansas Pacific Railway Company from interfering in any manner with the plaintiff's possession of the telegraph line. A writ of injunction was issued out of that court pursuant to such order, and due service thereof made on the officers of the railway company. The latter, assuming to be officers of another corporation called the Union Pacific Railway Company, which was organized about the first of February last by consolidating the Union Pacific Railroad Company and the Denver Pacific Railway & Telegraph Company with the said Kansas Pacific Railway Company, disregarding the writ, took possession of the telegraph line for and in the name of the said Union Pacific Railway Company. The cause was afterwards removed into this court, under the act of congress of 1875, and a supplemental bill was filed, in which the said Union Pacific Railway Company consolidated, and others, were made defendants with the Kansas Pacific Railway Company. In this bill, and upon the argument, the right of the several corporations before mentioned to unite in the manner pursued in organizing the Union Pacific Railway Company, is denied; and it is claimed that the officers of the railway company, whether acting for the Union Pacific Company, assuming that company to have been legally organized, or for the Kansas Pacific Company, were guilty of disobedience to the writ of injunction issued from and out of the district court of the state, for which they should be punished. When that question shall be considered it may become necessary to examine the proceedings of the several corporations looking to consolidation, and to determine whether they are effectual;

and, if the consolidation shall be recognized, then it may become necessary to determine whether the officers of the consolidated company could lawfully disobey a writ directed to one of the companies forming such consolidated company. The argument at the bar was not directed to those questions, but rather to the case made in the supplemental bill to enjoin the defendants from any further use of the telegraph line, except as provided in the contract.

The validity and force of the consolidation is not necessarily involved in the issuance of a new writ, for the consolidated company, if properly organized, can claim no higher or better right than its predecessor, the Kansas Pacific Company. Upon the case made in the supplemental bill, the rights of all parties are referred to the contract, and, accordingly, that instrument has been attacked by defendants upon several grounds, which will now be discussed.

And, first, it is alleged that the railway company, having authority from congress to construct a line of telegraph as well as a railroad, could not delegate such authority to another corporation, charged by law with the duty of constructing a telegraph for the use of the general government and the public. It is said that the railway company could not, by contract or otherwise, substitute another in the performance of that duty. The contract shows that the line was to be built as required by the act under which the railway company was organized, and accepted by the government in fulfilment of that company's obligations, as by the act of congress that company is required to operate its road and telegraph line in a particular manner, and penalties are prescribed for failure therein. 18 St. 112. It is urged that the company must be vigilant in the performance of its duties, and cannot commit into other hands the functions with which it is itself endowed. If, however, all this should be conceded, its relevancy to the present controversy is not apparent. The telegraph company has not assumed to act under or in pursuance of the authority given to the railway company in respect to telegraph lines. It claims to be a corporation organized in the state of New York, with power inherent, to construct and maintain tele-

graph lines in all parts of the country; and it is plain enough that, in constructing the line in controversy, it proceeded in the exercise of such power, real or assumed, and not in virtue of authority derived from the railway company. It is true that, in constructing the line in dispute, the parties intended that it should be accepted by the government in lieu of that which the railway company was required to build. That circumstance may affect the relations of the government to this property, but it does not prove that the telegraph company sought or attempted to appropriate to its own use the railway company's franchise. Acting in its own right, and assuming to have authority in that respect, the telegraph company entered into a contract with the railway company for building a telegraph on the right of way of the railway company; and the latter company, by making such contract, recognized the right and authority which the former company then assumed to have. As between the parties, the contract thus made may be and should be considered without reference to the power conferred on the railway company in respect to a telegraph. Independently of that authority, the railway company could contract with any telegraph company in respect to the lines of the latter on its right of way. For convenience in constructing and maintaining these, as well as to secure a direct course, the telegraph lines of a country are usually built along the lines of railway; and the railway companies have no necessary relation to them except as common carriers; that is to say, they carry the material for building and repairing them, and the men who do the work. In some instances the railway company owns and operates the telegraph, and in others it has an interest in the line, by which the use of it is secured. But these circumstances are entirely conventional, and no reason is perceived for denying to a railway company the right to contract for a dozen lines of telegraph on its right of way with as many different telegraph companies; and the circumstance that the railway company has power inherent to construct a telegraph for itself, is not at all controlling on this point. It may have its own telegraph, and contract with other companies for additional lines to any

extent. In that case the right of one company as against the railway company would not depend in any degree upon the relations of the latter with other companies, or with the power that created it. In ascertaining such right we should look only to the contract between the parties, disregarding the relations of each with other parties as *res inter alios acta.* So, in this case, the controversy is not whether the Kansas Pacific Railway Company has constructed a line of telegraph as required by its organic law, or has discharged any of its duties to the government. That is a question which concerns the government only, and which cannot arise between these parties, unless, indeed, it should be alleged that the contract has been violated in respect to the service to be rendered to the government. In some incidental way the question might come to the surface upon a charge of a breach of contract, but that is not made in this record, and therefore the question is not presented in that aspect. Properly understood, the question at issue is whether the contract between these parties shall be avoided on the ground that the telegraph company has usurped a function of the railroad company, or for want of capacity in the latter to make it. Upon that question I am of the opinion that the objection is without foundation.

It is also objected that the fifth clause of the contract is in restraint of trade, and against public policy. In that clause the railway company agrees not to transport men or materials for any other telegraph company at less than the regular rates for passengers and freight, and not to give permission to any such company to erect another line on its lands or roadway. This stipulation appears to be in opposition to the act of congress of 1866, to aid in the construction of telegraph lines, (14 St. 221,) and perhaps it is, for that reason, without effect; but, if that view shall be accepted, that paragraph may be eliminated from the contract without impairing other provisions of the same instrument.

The contract is peculiar, in that the acts to be done by the parties respectively, towards maintaining the line for their joint use, are obviously the essential feature of the agreement.

Casting out the fifth paragraph, the contract is not affected in respect to consideration. 2 Chitty's Contracts, 1001; 2 Parson's Contracts, 505. If, however, that paragraph is not obnoxious to the last-mentioned statute, it is not otherwise open to criticism. By its terms other companies may have men and materials transported over the railway at the usual rates, and a telegraph line may be built on other lands as well as those belonging to the railway company. Counsel will find a very good opinion on that point in 7 Bissell, 367. So, also, it may be said that a restrictive stipulation in a contract is without force, where, as in Colorado, the law provides for condemning lands for the use of a telegraph. If the railway company should refuse to allow another telegraph company to build on its lands because it has agreed with the plaintiff so to do, or for any other reason, the law will open the way for such other companies when thereunto requested.

The authority of the railway company over its right of way and its title thereto, as whether absolute or less, does not arise in this discussion. What has been said must be regarded as referring to the company's interest in the way, as against telegraph companies, whatever that interest may be.

A third objection to the contract is founded on the fourth paragraph, which provides that the business of the railway company, and the *family, private, and social messages of the executive officers* shall be transmitted without charge between all stations on the line of said railway, and also between all such stations and the city of St. Louis, Missouri, and elsewhere in the United States, over all other lines of the telegraph company, with certain limitations therein specified. In so far as this relates to the free use of the lines of the telegraph company by the officers of the railway company, in respect to their private affairs, no attempt has been made to sustain it. That the contract was made by and on behalf of the railway company, and that the consideration for all the promises of the telegraph company, including that which relates to the transmission of messages, is furnished by the railway company, is too plain for argument; and it must be conceded that the officers of the railway company, in securing to themselves

personally the use of the telegraph, which was of some value, used the corporate property for their own advantage, and thus abused the trust committed to their charge. We may acquit them of any intent to wrong their company, and say that the stipulation is an expression of courtesy on the part of the telegraph company towards those with whom they were intimately associated in business. In civility to each other officers of corporations may surpass the interests of their constituents in a manner which cannot be sanctioned by the law; and it should never be said that the obligations of civility and courtesy, as known and recognized among officers of corporations, may be framed into contracts to bind their principals. To trust so much to the exuberance of generous hearts would seriously endanger corporate property. Read it as we will, the contract secures to the officers of the railway company the free use of the telegraph in respect to their private affairs, and no explanation can be made that will break the force of that statement. That the privilege thus secured was of some value, will not be denied; and the fact that the officers could not have been induced to accept the like value in any other form is of no weight. To insert such a stipulation in the contract was a misuse of the corporate property for which the contract itself may be avoided. Field on Corporations, 174. As already stated, however, the railway company did not disaffirm the contract, but proceeded in the execution of it until recently, a period of more than 13 years. In most cases ratification would be implied from such use and enjoyment, and the contract would have become irrevocable. Such would be the rule if the free use of the telegraph had been limited to the officers who were concerned in making the contract; but the provision extends to all officers of the company, as well those who were to come after as those who made the contract, and thus it is kept alive by continuous feeding. In this, as in other respects, the contract appears to stand upon continually-recurring acts of the parties. The railway company can hardly be charged with negligence in failing to repudiate an agreement which continually sup-

plied its officers with reasons for keeping silent; and so we must say that the railway company is still at liberty to rescind the contract if it wishes to do so; but rescission does not mean that either party may appropriate to its own use the joint property of both, acquired under the contract, without paying therefor. 2 Chitty's Contracts, 1089n. In so far as the contract has been executed both parties are bound, and the right of each in the property acquired pursuant to its provisions must be respected. The seizure of the line on the twenty-seventh of February, by the railway company, was clearly as illegal as if the contract were free from objections. Whether there is any means by which either party may acquire the interest of the other in the property in controversy is not a question now presented for consideration. Nor is it necessary to ascertain what interest each party has in the telegraph line. It is enough that the property is owned by the parties to the contract jointly, and that the railway company has wrested the possession from its associate without warrant or authority of law. The parties must be restored to the position in which they were before the seizure, and for that purpose the injunction will be allowed.

NOTE. See *Western Union Telegraph Co.* v. *Union Pacific Railway Co.* 3 FED. REP. 721.