## CORPORATION TRUST CO. v. LOGAN et al.

### Civil Action No. 334.

District Court, D. Delaware.

Dec. 11, 1943.

Edwin D. Steel, Jr. (of Morris, Steel & Nichols), of Wilmington, Del., for Arthur G. Logan et al., plaintiffs.

Aaron Finger (of Richards, Layton & Finger), of Wilmington, Del., and Gerald Donovan, of New York City, for William G. Maguire et al., defendants.

LEAHY, District Judge.

I. *Applicability of the Securities Act of 1933.* The question for decision is whether the Voting Trust Agreement of April 12, 1943 contemplates the issuance of a security[4] in connection with a public offering under the provisions of the Act, where admittedly interstate means of communication and transportation were utilized in connection with the transaction, and no attempt was made to register under the statute. Defendants base their right to relief on Sec. 12(1) of the Act, 15 U.S.C.A. § 77*l*(1).

The Act prohibits the issuance of non-exempt securities and non-exempt transactions without the filing of a registration statement. Criminal[5] as well as civil sanctions[6] are found in the statute. Under one provision,[7] Sec. 12(1), a civil liability is created where a sale of a security is had without the filing of a registration state-

[4] 15 U.S.C.A. § 77b.
[5] 15 U.S.C.A. § 77x.
[6] 15 U.S.C.A. § 77k.
[7] 15 U.S.C.A. § 77*l*(1).

ment. This is the section which has our attention.

Sec. 2(4) defines an "issuer" as "* * * every person who issues or proposes to issue any security; except that with respect to * * * voting-trust certificates * * * the term 'issuer' means the person or persons performing the acts and assuming the duties of depositor or manager pursuant to the provisions of the trust or other agreement or instrument under which such securities are issued * * *" The statutory definition of a "security" is, however, the beginning point. Sec. 2(1). It includes a voting trust certificate.[8] SEC Release No. 97, Part I, dated December 28, 1933, which I take from 1 C.C.H., Federal Securities Service, 2nd Ed., par. 2323, n. 10, states: " 'There can be no question but that voting trust certificates are subject to the provisions of the Securities Act of 1933. The definition of the term "security" contained in Section 2(1) of the Act, expressly includes a "voting-trust certificate." Every security must have an issuer. Under Section 2(4), which again specifically mentions voting trust certificates, the term "issuer" means the person or persons performing the acts and assuming the duties of manager pursuant to the provisions of a trust agreement. This can mean no one other than the voting trustees themselves.[9] If, as seems clear from these two sections, the issue of voting trust certificates was intended to be subject to the Act, the ordinary transaction in which the certificates are delivered against the deposit of securities under the trust must have been intended to be included within the concept of a sale.' "

Assuming that all of the foregoing is applicable, the question remains as to whether the transactions here involved are specifically exempt under Sec. 4(1) of the Act[10] which provides that an exempted transaction is one involving "transactions by an issuer not involving any public offering." The Voting Trust Agreement throws some light on this question. It is not an agreement between particular individuals.[11] In fact, it provides (Art. First (2) and (3)):

"2. Any present or future holder of Class 'B' Stock of the Corporation, whether now authorized and outstanding, or hereafter authorized and/or issued, may at any time become a party to this Agreement, as fully as though such holder had executed this Agreement in the first instance on the date hereof by (a) executing this instrument at a later date and depositing with the Voting Trustee, or with the said Agent, the certificate or certificates for his or her shares of Class 'B' Stock, properly endorsed in blank or to the Voting Trustee, and stamped as aforesaid, or (b) transferring and delivering the Class 'B' Stock owned by him or her to the Voting Trustee, either by causing the certificate or certificates therefor to be issued in the name of the Voting Trustee and depositing the same with the Voting Trustee or said Agent, or (c) depositing the certificate or certificates of Class 'B' Stock representing the said shares with the Voting Trustee or with the said Agent, duly endorsed in blank (or accompanied by proper instrument of assignment and transfer thereof in blank duly executed), with the necessary transfer tax stamps attached thereto.

"3. The Stockholders hereby severally agree to accept and receive, in exchange for all shares of the Class 'B' Stock so transferred to and deposited with the Voting Trustee and/or Agent, Voting Trust Certificates as hereinafter provided; and the Stockholders further agree that the shares of Class 'B' Stock of the Corporation represented by the Voting Trust Certificates issued and to be issued hereunder, together with such other shares of the Class 'B' Stock of the Corporation as may hereafter from time to time be deposited hereunder, shall be held by the Voting Trustee until April 1st, 1953, or if this Agreement shall be sooner terminated as hereinafter provided, then until such earlier date, upon and subject to all of the trusts, terms and conditions of this Agreement, to which the Stockholders, by accepting such Voting Trust Certificates, consent and agree."

---

[8] 15 U.S.C.A. § 77b(1).

[9] See footnote 15 infra for comment on whether defendant Maguire, as Voting Trustee and therefore as the issuer, has violated the Act.

[10] 15 U.S.C.A. § 77d.

[11] The agreement is with "* * * such of the holders of the shares of the Class 'B' Capital Stock of Missouri-Kansas Pipe Line Company, a corporation organized under the laws of the State of Delaware, as may become parties to this Agreement in the manner hereinafter provided."

Pursuant to Sec. 18 of the Delaware Corporation Law,[12] copies of the Voting Trust Agreement were filed with Mokan and Industrial Trust Company, as agent.

No case has been found which decides that a public offering exists upon a set of facts such as presented here. At an early date, it was once suggested that an offer to not more than twenty-five persons or less was not a "public offering" within the meaning of the statute.[13] However, in Release 285, January 24, 1935, John J. Burns (then General Counsel of the Commission) rendered an opinion in which various factors were said to be necessary for consideration in determining what constituted a public offering. I quote one of these factors discussed by Judge Burns:

"I conceive that the following factors in particular should be considered in determining whether a public offering is involved in a given transaction:

"1. *The Number of Offerees and Their Relationship to Each Other and to the Issuer*

" 'You will note that this does not mean the number of *actual purchasers,* but the number of persons to whom the security in question is *offered* for sale. The word *"offering"* in this sense should not be *limited to those cases wherein a formal proposal for a firm commitment is submitted.* * * *

" 'Again, in determining what constitutes a substantial number of offerees, the *basis* on which the offerees are selected is of the greatest importance. Thus, an offering to a given number of persons chosen, from the general public on the ground that they are possible purchasers may be a public offering even though an offering to a larger number of persons who are all the members of a particular class, membership in which may be determined by the application of some pre-existing standard, would be a non-public offering. However, *I have no doubt but that an offering restricted to a particular group or class may nevertheless be a public offering if it is open to a sufficient number of persons.' "* (Italics supplied).

Later, in Securities and Exchange Commission v. Sunbeam Gold Mines Co., 9 Cir., 95 F.2d 699, 702, after reviewing the legislative history of the Act, the court said: "These Reports clearly demonstrate that the Congress did not intend the term 'public offering' to mean an offering to any and all members of the public who cared to avail themselves of the offer, and that an offering to stockholders, other than a very small number, was a public offering. * * * Section 4(1) makes an exception of those 'transactions by an issuer not involving any public offering'. Being an exception from the general policy of the act, anyone claiming to be within its terms has the burden of proof that he belongs to the excepted class—that is, that his offer is not to the public (cases cited). * * * Furthermore, the terms of such an exception to the 'general policy' of the act must be 'strictly construed' against the claimant of its benefit."[14]

Here, the pleadings disclose that Mokan has authorized capitalization which includes 5,000,000 shares of Class B stock. It was conceded at argument that there are approximately 800,000 of such shares now outstanding distributed among 3,500 public holders. As the trust agreement is an "open-end" type of voting trust agreement, the offer palpably runs to thousands of persons. Under Sec. 18 of the Delaware Corporation Law that agreement is for the inspection of all stockholders and invites them to become holders of Voting Trust Certificates not only by formally becoming parties thereto, but also by a simple procedure they are merely requested to send in their shares and receive Voting Trust Certificates in exchange therefor. In view of the heavy authorization of Class B stock, and in the event of sales of this substantial and unissued block, potential offerees among the public are legion. I think I am

---

[12] Sec. 18 of the Delaware Corporation Law, Rev.Code of Delaware of 1935, c. 65, § 2050, p. 467, provides, in part, that "After the filing of a copy of such agreement in the principal office of the corporation in the State of Delaware, which copy shall be open to the inspection of any stockholder of the corporation or any beneficiary of the trust under said agreement daily during business hours, * * *."

[13] See, 1 C.C.H. Federal Securities Law Service, par. 2266, n. 18, and editorial comment: "This opinion, however, does not express the view of the Commission at the present time. See par. 2266.17 above."

[14] Other cases indicate that it is the offering, not sale, which must be public. See, Black v. Solano Co., 114 Cal.App. 170, 299 P. 843. Cf. Par. 2266.60 of C.C.H., Federal Securities Law Service for comment on cases decided under the English Companies (Consolidated) Act.

carrying out the spirit of the Act in reaching my conclusion that we have present here a public offering. This conclusion is, in fact, based on the proposition that as the statute is remedial in nature, it is to be liberally construed.[15] See Securities and Exchange Commission v. C. M. Joiner Leasing Corporation, 64 S.Ct. 120, decided November 22, 1943, and United States v. Monjar, D.C.Del., 47 F.Supp. 421, 426.

## II. *The Statutory Remedies.*

Plaintiffs urge that, assuming a violation of the Act, the remedy sought is not available in the instant case under the decision of Frost & Co. v. Coeur D'Alene Mines Corporation, 312 U.S. 38, 61 S.Ct. 414, 416, 85 L.Ed. 500. In that case, an assignor of Frost had an option to buy 1,300,000 shares of the defendant company's treasury stock at 10¢ a share. Later the agreement was amended to provide that the company would sell the stock and credit Frost with the proceeds above 10¢ a share. After certain shares were sold at prices above 10¢ a share, Frost had a credit of $16,306. Before payment, the defendant repudiated the agreement and refused to pay not only the $16,306 due but any further sums, on the ground that there had been no registration under the Act. Frost sued in the state court in Idaho. The state supreme court held the contract void ab initio as being in violation of the Act. The Supreme Court reversed, holding: "No provision of the Act declares that in the absence of registration, contracts in contemplation or having relation to a public offering shall be void." This language of Mr. Justice McReynolds obviously has no reference to those particular contracts which are prohibited by the Act, i. e., a sale of an unregistered security. In the Frost case neither party was invoking the sanctions contained in the Act. That defendant was simply asking the court to apply a sanction not in the Act is shown by the Court's view that:

"Although the challenged contract bears no evidence of criminality and is fair upon its face, we are asked to apply a sanction beyond that specified by declaring it null and void because of relationship to a public offering. The basis for this demand is a supposed federal public policy which requires such annulment in order to secure observance, effectuate the legislative purpose and prevent noxious consequences.

"Courts have often added a sanction to those prescribed for an offense created by statute where the circumstances fairly indicated this would further the essential purpose of the enactment; but we think where the contrary definitely appears—actual hindrance indeed of that purpose—no such addition is permissible. The latter situation is beyond the reason which supports the doctrine now relied upon."

However, the remedy sought here finds support, I think, in Deckert v. Independence Corp., 311 U.S. 282, 61 S.Ct. 229, 233, 85 L.Ed. 189.[16] That case reviewed an opinion from this circuit, 108 F.2d 51. The action under Sec. 12(1) of the Act was by a bill in equity for rescission of a sale and restitution of the consideration paid, and to enforce the right of restitution against an insolvent third party who was in possession of assets belonging to the vendor of the shares. The Circuit Court sustained the jurisdiction of the lower court under the Act, but held that the statute merely contemplated a monetary decree or money judgment payable to the plaintiff. The Supreme Court sustained the Circuit Court on the jurisdictional point but reversed, in part, by holding that relief under Sec. 12(1) is not limited to a return of the consideration in the form of a money judgment. In discussing the equitable remedy of rescission available under the statute, the Court said:

"We think the Securities Act does not restrict purchasers seeking relief under its provisions to a money judgment. On the

---

[15] Plaintiffs challenge defendants to point out what act of what person constituted the violation of the statute. Sec. 5(a) (2) prohibits transportation of securities for the purpose of sale or delivery. The fact that defendant Tringham transported the Voting Trust Certificates to New York City and thereafter utilized the mails in sending them to the depositing stockholders sufficiently shows violation. Of course, he was not the "issuer" under Sec. 5(a). Neither were any of the other parties—be they plaintiffs or defendants. I do not think it calls for ingenious subtlety to conclude that all acts taken by the parties after the execution of the Voting Trust Agreement on April 12, 1943 were done on behalf of Maguire, as Voting Trustee, if for no other reason than for convenience.

[16] The suggestion that the Frost case is a different type of case from the case at bar seems supported by the fact that the Deckert case, decided less than two months before the Frost case, is not even mentioned in the Frost opinion.

contrary, the Act as a whole indicates an intention to establish a statutory right which the litigant may enforce in designated courts by such legal or equitable actions or proceedings as would normally be available to him. Undoubtedly any suit to establish the civil liability imposed by the Act must ultimately seek recovery of the consideration paid less income received or damages if the claimant no longer owns the security. Section 12(2), 15 U.S.C. § 77l (2). * * * But Section 12(2) states the legal consequences of conduct proscribed by the Act; it does not purport to state the form of action or procedure the claimant is to employ.

"Moreover, in Section 22(a), 15 U.S.C.A. § 77v(a), specified courts are given jurisdiction 'of all suits in equity and actions at law brought to enforce any liability or duty created by this subchapter.' The power to enforce implies the power to make effective the right of recovery afforded by the Act. And the power to make the right of recovery effective implies the power to utilize any of the procedures or actions normally available to the litigant according to the exigencies of the particular case. * * *"

It is clear that the case at bar comes within the first classification of Sec. 12 which relates to unlawful sales of securities for which no registration statement has been filed. Under that section, the remedy afforded is the right to sue, either in law or in equity, "to recover the consideration paid for such security * * *." As the Voting Trust Certificate is, under the statute, the security, the consideration paid

in exchange therefor can only be the Mokan stock, and it is this stock which defendants seek to have restored to them upon the tender of their trust certificates. I conclude the statute authorizes the relief prayed for here.[17]

■■■ The final argument urged by plaintiffs assumes there has been a violation of the Act, but it challenges the specific relief sought by defendants. Plaintiffs state that if the "open-end" provisions of the Voting Trust Agreement might result in the subsequent deposit of shares by holders of Class B stock, the court could enjoin Industrial Trust Company, as agent, from issuing any further Voting Trust Certificates unless and until a registration statement has been filed.[18] This proposition is based upon the rule [19] that where one of several terms of an agreement is illegal, the agreement is not stricken down in toto, but compliance with the legal provisions will still be compelled, even where the invalid provisions are due to violation of a statutory provision. Under such a view, I believe the court could restrain the further issuance of voting trust certificates, as such issuance would constitute a violation of the Act, and, as the parties have agreed among themselves that if one provision of the Voting Trust Agreement is found invalid, it being severable and independent of the others, the court could determine that the remainder of the agreement still retains legal vitality. If the Securities and Exchange Commission, for example, had instituted an action under Sec. 20(b) seeking an injunction against the violation present here, I believe the

---

[17] Sec. 16 of the Act, 15 U.S.C.A. § 77p, provides: "Additional remedies. The rights and remedies provided for by this subchapter shall be in addition to any and all other rights and remedies that may exist at law or in equity." Under this section it may be argued with some force that even if Sec. 12 did not exist, defendants would still be entitled to the relief sought. · This view finds support in Doherty v. Bartlett, 1 Cir., 81 F.2d 920, where the court, in applying a state Blue Sky Law which contained penal but no civil sanctions, granted relief. See, Williston (Rev.Ed.) Contracts, § 1765. Cf. Cecil B. De Mille Productions v. Woolery, 9 Cir., 61 F.2d 45.

[18] In support of this argument plaintiffs point to Article Seventh, par. 6 of the Voting Trust Agreement which provides: "The invalidity of any one or more phrases, sentences, clauses, paragraphs, sec-

tions or articles of this agreement shall not affect the remaining portions or any part thereof, and in the event that one or more of the phrases, sentences, clauses, paragraphs, sections or articles contained herein should be invalid, this Agreement shall be construed as if such invalid phrase or phrases, sentence or sentences, clause or clauses, paragraph or paragraphs, section or sections, article or articles, had not been inserted herein."

[19] The rule finds full flower in the restrictive employer-employee covenants. See, Capital Bakers v. Leahy, 20 Del. Ch. 407, 178 A. 648; Jacobs v. Clark, 112 Vt. 484, 28 A.2d 369; Western Union Telegraph Co. v. Kansas Pacific Railway Company, D.C., 4 F. 284 (involving restrictions on railroad transportation); and McCullough v. Smith, 8 Cir., 243 F. 823.

relief to be granted, under such circumstances, would be the precise relief which plaintiffs here suggest. But, we are not concerned with the remedial provisions of Sec. 20(b). Defendants are proceeding under the civil sanctions imposed by Sec. 12(1), and there can be escape from the direct application of that provision. There is no attempt to score points against plaintiffs' argument to state that if the agreement was tainted originally with illegality then any party who desires should, I believe, be free from the bondage of such an instrument.

Plaintiffs' motion to dismiss defendants' amended counterclaim is denied.