John P. KINSEY, individually, and as a Director and Stockholder of Monroe Paper Products Company, a Michigan corporation, Lawrence G. Kunkel and the Waterbury Corrugated Container Co., a Connecticut corporation, individually and as Stockholders of said Monroe Paper Products Company, Plaintiffs,

v.

Burton S. KNAPP, Charles E. Raney, George A. Blum, Don B. Leathers and Arthur W. Sempliner, individually and as Directors and Stockholders of said Monroe Paper Products Company, and as Trustees under Voting Trust Agreement dated as of December 31, 1953 pertaining to stock herein; George J. Huber, individually and as Chairman of Stockholders' Committee of Monroe Paper Products Company stock, and said Monroe Paper Products Company, Defendants.

No. 13179.

United States District Court
E. D. Michigan, S. D.

July 30, 1957.

Judgment Vacated by Court of Appeals
Dec. 6, 1957.

George E. Brand, George E. Brand, Jr., Detroit, Mich., for plaintiffs.

Fischer, Sprague, Franklin & Ford, Hugh Francis, Charles H. King and Arthur W. Sempliner, Detroit, Mich., for defendants.

PICARD, District Judge.

Plaintiffs move this court, pursuant to Rule 54(b), F.R.C.P., 28 U.S.C.A. to invalidate a voting trust agreement while reserving judgment on damages and other related issues of fact raised by their complaint.

#### Findings of Fact.

All plaintiffs are stockholders of Monroe Paper Products Company, and plaintiff Kinsey is, in addition, a director. Defendants, Knapp, Blum, Raney, Leathers and Sempliner are directors and also trustees under the above voting trust agreement. Defendant Huber, neither a trustee nor director, was chairman of the stockholders' committee which allegedly participated in creating the trust agreement.

The controversial trust, which empowered defendant trustees to vote 95,244 shares of Monroe's stock was created at a time when plaintiffs and defendants were waging a fight to gain financial and managerial control of the corporation. The fight followed the death of Alex J. Groesbeck, its president, on May 10, 1953, owning 32,814½ of the 190,000 shares of Monroe stock and who had been for years the dominant figure in the company's operation, control and management. Ex-Governor Groesbeck died in 1953 and in September, 1953 National Container Corporation made a public offer to purchase all, but not less than 55.6% of Monroe's outstanding stock thus precipitating the battle for control, which first stage began in September, 1953 with the establishment of an escrow

agreement by defendants and was augmented in December, 1953, when the voting trust agreement was consummated.

Defendants' escrow agreement, which was put into effect immediately after National Container's purchase offer, but shortly before the 1953 stockholders' meeting, was designated to defeat acceptance of that offer. That escrow agreement provided that any person wishing to purchase company stock for $10 per share could deposit money in a fund to be held by the Monroe State Bank for that purpose. Plaintiffs allege that defendants, by soliciting company customers, suppliers, employees, and by contributions of $15,000 by Raney, $15,000 by Leathers and $5,000 by Blum respectively, were able to secure deposit of $162,000 in escrow with which was purchased 15,538 shares of company stock both through means criticized by plaintiffs as fraudulent and with these secured proxies as well as other stock controlled by them, along with their individual holdings, enabled them to defeat the National Container offer and secure their own re-election as directors.

But the threat that plaintiffs might still be able to purchase controlling interest in Monroe shortly, remained, so to neutralize this possibility the voting trust agreement was executed on December 31, 1953, as a permanent proxy to defendants for a period of five years. Plaintiffs claim that the voting trust, thus created again by alleged devious means, is void or at least voidable as a matter of law and they have enumerated the following five reasons why that voting trust is void and one reason why it is voidable.

Void—because it

(1) Violates the Michigan Restraint of Trade Law, Comp.Laws Mich.1948, §§ 445.701(5), 445.708, M.S.A. 28.31(5) and 28.36;

(2) Violates the Sherman Anti-Trust Act 15 U.S.C.A. §§ 1–7, 15 note;

(3) Violates Michigan Common Law against restraints on the alienation of property;

(4) Places each director in an inconsistent position as director and trustee in violation of his fiduciary duties as the former; and

(5) Defendants, in creating the trust violated 15 U.S.C.A. § 78cc and Rule X 10B–5 of the Securities Exchange Commission.

Voidable—because

(1) Neither the agreement, nor certificates issued pursuant thereto, were registered as required by the Securities Act of 1933, 15 U.S.C.A. § 77a et seq., and Michigan Blue Sky Law, Comp.Laws 1948, § 451.107, M.S.A. 19.747.

Conclusions of Law.

We briefly discuss and decide these contentions seriatim.

1. Is trust agreement void because in violation of Michigan's laws against Restraint of Trade?

Sub-paragraph (5) of M.S.A. 28.31 provides inter alia, that it shall be unlawful for two or more persons to agree not to sell any article or commodity below a common fixed price, or in any manner establish or settle the price of any article so as to directly or indirectly preclude free and unrestricted competition for the purchase thereof. M.S.A. 28.36 declares that any contract violation of sub-paragraph (5) is against public policy and absolutely void.

True under the trust agreement the stockholders agreed that the stock deposited thereunder could not be sold for (a) less than $15 per share and (b) only if the purchaser would purchase all of the stock so deposited. But we do not agree with plaintiffs' claim that all price fixing is illegal under Michigan law; on the contrary only contracts embodying unreasonable price fixing provisions. Staebler-Kempf Oil Co. v. Mac's Auto Mart, Inc., 329 Mich. 351, 45 N.W.2d 316. In Hubbard v. Miller, 27 Mich. 15, at page 19, Chief Justice Christiancy narrowed the prohibition to the reasonableness of any contract encompassing price fixing. He said:

"* * * if, considered with reference to the situation, business and

objects of the parties, and in the light of all the surrounding circumstances with reference to which the contract was made, the restraint contracted for appears to have been for a just and honest purpose, for the protection of the legitimate interests of the party in whose favor it is imposed, reasonable as between them and not specially injurious to the public, the restraint will be held valid."

We hold that at this point this trust agreement is not unreasonable from any angle, "business situation", "objects of the parties" designed "for the protection of the legitimate interests of the parties" or "not specially injurious to the public" as a matter of law.

■ 2. Does the trust agreement violate the Sherman trust law?

Here again plaintiffs base invalidity upon alleged price fixing and restraint of trade features of the agreement. Section 1 of the Sherman Anti-Trust Act, 15 U.S.C.A. § 1, condemns as illegal

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations."

While the Sherman Act, like the Michigan Restraint of Trade Act, does not encompass and condemn all activity that may restrain trade (Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311) unlike the Michigan Act, price fixing under the Sherman Act is illegal per se (United States v. McKesson and Robbins, 351 U.S. 305, 76 S.Ct. 937, 100 L.Ed. 1209) if it affects commerce among the States, and is not exempt by the law,[1] the good intentions of the parties to the agreement, and the reasonableness thereof to the contrary notwithstanding.

■ Here we are not concerned with reasonableness, dependent upon circumstances and facts surrounding the execution of the trust agreement, but only with whether the agreement fixes prices so that it restrains commerce among the states.

And again we find that plaintiffs' contention that the trust agreement in question fixed prices is not well founded. As stated in United States v. Bausch & Lomb Co., 321 U.S. 707, at page 722, 64 S.Ct. 805, at page 813, 88 L.Ed. 1024, quoting United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992,

"'* * * the Sherman Act 'does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal; and, of course, he may announce in advance the circumstances under which he will refuse to sell.'"

It may be appreciated, therefore, that limitation upon exercise of this right is that the seller may not, under the Sherman Act, go beyond exercise of the right, and unduly hinder, by contract or other means, the free natural flow of interstate commerce. In the case at bar the stockholders under the trust agreement simply authorized the trustees not to sell to any person who would not buy all of their stock at $15 per share. They went no further. Such authority of trustees to sell only upon certain conditions, or indeed, to refuse to sell at all, is a feature indispensable to the existence of such agreements. Voting trusts are authorized in nearly all, if not all, of the forty-eight states. We do not divine the congressional intent, at the time the Sherman Act was enacted, to have been to outlaw such agreements by implication and we will not make that result possible by abuse of the power of judicial construction.

Aside from the foregoing, we entertain grave doubts as to whether the trustees and the stockholders under the trust agreement limited activity that

1. Miller-Tydings Act 50 Stat. 693, 15 U.S.C.A. § 1, and the McGuire Act 66 Stat. 632, 15 U.S.C.A. § 45.

may be characterized as "commerce among the several states." The trust was consummated in Michigan, and it is clear that, for the most part, economic repercussions therefrom will not reach beyond the borders of this state. See Lawson v. Woodmere, 4 Cir., 217 F.2d 148, 151; Spears Free Clinic and Hospital v. Cleere, 10 Cir., 197 F.2d 125.

We deny the motion insofar as it is based upon the instant contention.

■ (3) Does the trust agreement violate the common law of Michigan against restraints on the alienation of property?

Plaintiffs cite several Michigan cases to sustain this contention. In other words, if an instrument limits the persons to whom property can be sold, either by specific designation, or by setting a price exceedingly high or exceedingly low, such instrument has the effect of removing the property from the market and is void as a restraint on the right of alienation. This court is of the opinion that the Michigan cases do not support plaintiffs' position. Indeed, the most recent case on the subject, Lantis v. Cook, 342 Mich. 347, 69 N.W.2d 849, cited by plaintiffs to sustain their contentions, holds to the contrary. In that case Michigan's Supreme Court held valid a deed which provided that if the grantees decided to sell the property conveyed in lieu of using it as a homestead, they must first offer it to the grantor for $4,000. In that case the deed fixed a price and in addition thereto, determined who could purchase. Yet the court held it was not an illegal restraint on alienation. In the case at bar the stockholders by use of a voting trust merely did what they had a right to do, i.e. divorced their legal and equitable interest in the stock by conveying the former to the trustees while retaining the latter for themselves. This case is, we believe, dead against plaintiffs in the majority opinion. See also Ecclestone v. Indialantic, Inc., 319 Mich. 248, 29 N.W.2d 679. Any restraint or alienation resulting therefrom was merely incidental—was not the main purpose of the agreement, and did not ad-

versely affect its validity. Lantis v. Cook, supra.

■ (4) Did the voting trust agreement place defendant directors in an inconsistent position in violation of their fiduciary duties?

Plaintiffs' assertion that the trust agreement placed defendants in a position antagonistic to their fiduciary duties as directors is based upon the following:

(a) A 1952 stockholders' resolution required defendants as directors to purchase stock on behalf of the corporation, while their duties as trustees required them to make such purchase impossible, since under the trust no stock could be purchased by the corporation or any other person unless 95,000 shares were purchased; and

(b) Under the trust agreement and the escrow agreement which preceded it, defendants were permitted to, and did purchase stock for their own benefit while the 1952 stockholders' resolution required them as directors to make such purchases on behalf of the corporation.

While plaintiffs claim that a 1952 stockholders' resolution requires defendant trustee directors to purchase stock for the corporation, this is denied by the latter. They contend that the stock purchase resolution was no longer in effect when they purchased stock for themselves, nor was it in effect at the time the trust agreement was executed, and their assumption of their duties of trustees. These issues should be decided only after proofs have been taken and not on motion for summary judgment.

Seagrave Corp. v. Mount, 6 Cir., 212 F.2d 389 and Ashman v. Miller, 6 Cir., 101 F.2d 85 cited by plaintiffs, were decided only after it had been proven that the loyalty of a director actually was divided between self interest and duty to the corporation and its stockholders and so a conflict existed. Here again this calls for proof.

■ (5) Did defendants, in creating the trust agreement violate Section 78cc of the Securities Act of 1933 and Commission Rule X–10 B–5, both of which

declare that use of any "Artifice or device to defraud" or the "making of any untrue statement" renders such contract void.

This reason is based on the letter allegedly sent by defendants to certain stockholders, in order to induce them to subject their stock to the trust and which allegedly contained a false and untrue statement. The charge is immaterial since the facts are denied by defendants and until such time as the court is able to hear testimony we withhold judgment thereon denying plaintiffs' motion for summary judgment on this ground.

We come now to plaintiffs' claim that the trust agreement is

## Voidable.

1. Because of failure to register the same under the Securities Act of 1933 and/or the Michigan Blue Sky Law.

The Securities Act of 1933 does prohibit use of interstate commerce mediums of communications (mail, transportation, etc.) to facilitate the sale of any security not registered with the Securities Exchange Commission and provides Civil and Criminal penalties for the violation thereof. See Section 77l and 77. But its applicability is premised upon certain conditions—

1. A public offer by an insurer to sell or buy;

2. The security so offered must not be registered, nor exempt, and must be of a type covered by the Act; and

3. There must have been use of the instrumentalities of interstate commerce to buy, sell, exchange or offer to do any of the foregoing.

Here we hold that the voting trust, the certificates and defendants' actions fall within the prohibitions of the Act for the following reasons:

1. "Security" includes voting trust certificates. Sec. 77b(1);

2. "Sale", "sell", "offer to sell" includes any attempt or offer to dispose of the securities. Sec. 77b(3). Sale also in-

cludes exchanges of securities. See United States v. Riedel, 7 Cir., 126 F.2d 81;

3. "Issuer" of the security includes and means the person or persons performing the acts and assuming the duties of depositor or manager pursuant to the provision of the trust or other agreement; and

4. An offer is public even though the offer is confined to stockholders of offering company. See Merger Mines Corp. v. Grismer, 9 Cir., 137 F.2d 335; Securities and Exchange Commission v. Sunbeam Gold Mines Co., 9 Cir., 95 F.2d 699.

Defendants admittedly failed to register the Voting Trust or the certificates with either the proper state or federal administrative agency and a letter soliciting stockholders to subject their stock to the Voting Trust was sent through the channels of interstate commerce. In view of the cases and sections above cited, there can be no doubt that defendants violated the Security Act. This is true because clearly defendants as issuers of the voting trust certificates made a public offering of a security covered by the Security Act. See Corporation Trust Co. v. Logan, D.C., 52 F.Supp. 999.

The trust agreement is voidable but the next question that presents itself for decision is what remedy, if any, is available to plaintiffs.

We believe Corporation Trust Co. v. Logan, supra, answers this problem. There a group of stockholders subjected their stock to a Voting Trust Agreement. The trustees issued voting certificates, but failed to file a registration statement. Subsequently, the stockholders tendered their voting certificates and asked for return of their stock certificates on grounds that the voting trust was illegal and void because there had been no compliance with the Securities Act of 1933. The court held in a well reasoned opinion that the stockholders were entitled to return of their stock. The ruling was made in face of the voting trustees' contention that if the stockholders were entitled to any relief at all it was by way of damages

or in the alternative by injunction until provisions of the Act relating to registration were complied with. The court rejected this argument citing Deckert v. Independence Shares Corp., 311 U.S. 282, 61 S.Ct. 229, 85 L.Ed 189 and Section 77*l*(1) of the Act. Quoting from the Deckert case, supra, the court said in 52 F.Supp. at page 1004:

"Moreover, in Section 22(a), 15 U.S.C.A. § 77v(a), specified courts are given jurisdiction 'of all suits in equity and actions at law brought to enforce any liability or duty created by this subchapter.' The power to enforce implies the power to make effective the right of recovery afforded by the Act. And the power to make the right of recovery effective implies the power to utilize any of the procedures or actions normally available to the litigant according to the exigencies of the particular case * * * ."

Then the court added:

"It is clear that the case at bar comes within the first classification of Sec. 12 which relates to unlawful sales of securities for which no registration statement has been filed. Under that section, the remedy afforded is the right to sue, either in law or in equity, 'to recover the consideration paid for such security * * * .' As the Voting Trust Certificate is, under the statute, the security, the consideration paid in exchange therefor can only be the Mokan stock, (certificates surrendered by the stockholders) and it is this stock which defendants (plaintiffs in the case before us) seek to have restored to them upon the tender of their trust certificates. I conclude the statute authorizes the relief prayed for here." (Parentheses ours.)

And finally at page 1005:

" * * * if the agreement was tainted originally with illegality then any party who desires should, I believe, be free from the bondage of such an instrument."

True, in the Logan case the stockholders who sought release of their stock from the voting trust were original parties to the agreement, while in the case at bar, plaintiff Waterbury is an assignee who had knowledge of the agreement's imperfection prior to its acquisition of the voting trust certificates, which fact tends to lend truth to defendants' contention that the voting certificates were purchased for the express purpose of bringing suit. But this is of no consequence. As held in Traer v. Clews, 115 U.S. 528, at page 539, 6 S.Ct. 155, at page 159, 29 L.Ed. 467, there is a distinction between the conveyance of a mere right to file a bill in equity and the conveyance of the property to which the former is attached. The former is "contrary to public policy and savoring of maintenance," but when the property itself is conveyed

"the fact that the grantee may be compelled to bring a suit to enforce his right to the property does not render the conveyance void",

or defeat the right to maintain suit.

In view of our holding that plaintiff Waterbury is entitled to renounce the voting trust because in violation of the Securities Act of 1933, we deem it unnecessary to unduly lengthen this memorandum with a detailed discussion of the parties' rights under Michigan's Blue Sky Law. Suffice to say that M.S.A. 19.747 prohibits sale of securities unless the same have been registered. Comp.Laws Mich.1948, § 451.120, section 19.760 provides that in cases where securities are sold in violation of the Blue Sky Law, the transaction is voidable at the election of the purchaser. Under the Michigan law, as under the federal, the fact that the person seeking to void the transaction is an assignee makes no difference. Rights under the Blue Sky Law are assignable. See Superior Piston Ring Co. v. Brown, Anthony & Co. Inc., 294 Mich. 358, 293 N. W. 679.

This is a court of equity. For failing to comply with the law should defendants

be rewarded for their wrong doing or condemned with nothing but a verbal chastising? We don't believe so.

We hold—

1. That the "trust agreement" was voidable and that plaintiffs are in a position to challenge it. Therefore with the date for the annual election coming in September we believe that this corporation and its stockholders should be put in status quo ante as far as possible. As a result of a resolution passed before dissention was apparent, the corporation did purchase certain stock from stockholders marked for retirement. Whatever that stock amounted to—we hold it should be placed in the treasury and not voted at the annual election;

2. Trust certificates purchased by Waterbury may be exchanged at the office of the corporation or with the depository, wherever they may be, for stock certificates in his name;

3. The original owners of all the stock sold since the trust agreement was entered into are hereby entitled to a return of the same upon payment of the consideration received by them when they sold their stock certificates and this must be done not later than September 1;

4. All holders of stock certificates who so desire may exchange their trust certificates for their own stock certificates on or before September 1, by written request, and if they fail to do so by that time then their failure will be taken as a granting of proxy authority by the trustees to vote the stock; and

5. A copy of the last four pages of this opinion to be sent to all stockholders of record as of December 1, 1953, on or before August 9, 1957.

In other words, we believe that a free election as near as we can have it, for the directors and controlling officers of this corporation should be held at the annual meeting, notice of which shall be given according to the by-laws by the proper officers so that perhaps this corporation may find an end to its troubles.

The above constitutes a partial judgment in this case at the present time chiefly as provided in Rule 54(b). We intend it to be appealable and determine there is no just cause for delay in having these issues finally settled.

We do not in this opinion decide anything on the facts. We do not hold that it is not possible that the proof might alter our decision as to whether or not this trust agreement is void or voidable on the facts. We do not pass upon any of the alleged wrongful acts of these directors.

Finally, we believe that the following questions of fact should be taken up later in the order selected by plaintiffs since plaintiffs have brought action:

(a) The alleged activities of these defendant directors and suppliers who purchased stock and the alleged "reward" to these suppliers in surplus inventory to the damage of the corporation;

(b) The alleged fraud of the Huber letter and his other alleged participation;

(c) The alleged fraud of the insurance appraisal;

(d) The alleged fraud of the representation of the amount of trust certificates then sold as sent to some of the stockholders in a certain list; and

(e) The alleged fraud of pensions granted to officers of the corporation through the efforts of these defendants or some of them.

There is nothing in this decision that prevents any stockholder or any one else from now purchasing the stock of the Monroe Paper Products Company wherever he may find it or for whatever price. This partial judgment is aimed to free the stock of this corporation as much as we can in view of the circumstances under which we find the corporation at the present time and to temporarily, at least, dispose of the alleged double and triple damage claims of plaintiffs based on the trust agreement by being void as a matter of law.