499 F.2d 715
 Blue Sky L. Rep. P 71,146, Fed. Sec. L. Rep. P 94,605
RESERVE LIFE INSURANCE COMPANY and Midland National Life
Insurance Company, Appellants,
v.
PROVIDENT LIFE INSURANCE COMPANY et al., Appellees.
 No. 73-1241.
 United States Court of Appeals, Eighth Circuit.
 Submitted Oct. 16, 1973.
Decided June 21, 1974, As amended on Denial of Rehearing
July 29, 1974.
 
 Alan L. Austin, Watertown, S.D., for appellants.
 John A. Zuger, Bismarck, N.D., for appellees.
 Before LAY and BRIGHT, Circuit Judges, and EISELE, District Judge.*
 BRIGHT, Circuit Judge.
 
 
 1
 This lawsuit originates in the efforts of management and directors of Provident Life Insurance Company (Provident), a North Dakota insurance corporation, to thwart attempts by outside interests to obtain a controlling interest in the company. In 1955, the principal officers and certain stockholders of Provident organized a voting trust for a 15-year term expiring November 15, 1970. The trust eventually procured the voting control of more than 60 percent of Provident's common stock. Prior to the trust's scheduled expiration date, the trustees sought permission from the trust beneficiaries to extend the trust for an additional 10 years to November 14, 1980. Upon solicitation, about two-thirds of the existing holders of voting trust certificates in Provident, representing 42.44 percent of the common stock of Provident, agreed to the extension.
 
 
 2
 During this solicitation, appellants Reserve Life Insurance Company (Reserve), a Texas insurance corporation, and Midland National Life Insurance Company (Midland), a South Dakota insurance corporation and a wholly owned subsidiary of Reserve, attempted to block the extension by contacting Provident shareholders and urging them to refuse to consent to the extension. This lawsuit is an adjunct of this attempt and was brought by Reserve and Midland to declare invalid the trustees' actions in obtaining consents for the extension of the voting trust and to require dissolution of the voting trust.[1] The action rests on allegations that, in soliciting for an extension and extending the voting trust, appellee-trustees and Provident violated the Securities Act of 1933 (15 U.S.C. 77a-77aa), the Securities Exchange Act of 1934 (15 U.S.C. 78a-78hh), and various provisions of the 'blue sky' laws of North Dakota and other states.
 
 
 3
 The district court, Judge Ronald N. Davies, presiding, denied Reserve and Midland relief. This appeal followed. Federal jurisdiction is established since the complaint in part alleges violations of federal securities statutes. The state claims are justiciable in this proceeding as proper matters for pendent jurisdiction.
 
 
 4
 During the pendency of proceedings in the district court, Reserve and Midland asked the Securities and Exchange Commission to intervene. Representatives of the Commission refused, and thus the district court did not have the benefit of the Commission's views. Because of the novelty of some of the questions, we invited the SEC to submit its views by way of an amicus curiae brief. The Commission agreed and filed a memorandum with respect to the applicability of the 1933 and the 1934 Securities Acts. This memorandum generally supports the views of the appellants. The appellees have been given an opportunity to respond to the amicus curiae brief and the Commission has filed a reply memorandum. We have taken these additional briefs into consideration.
 
 
 5
 On appeal, Reserve and Midland now reassert their contentions, previously considered but rejected by the trial court, that:
 
 
 6
 1) The extension of the voting trust was invalid under applicable provisions of North Dakota law.
 
 
 7
 2) The solicitation of consents to the extension of the voting trust was invalid because neither the voting trustees nor Provident registered the Provident voting trust agreement under the Securities Act of 1933.
 
 
 8
 3) The solicitation of consents to the extension of the voting trust was invalid since neither the trustees nor Provident undertook to register the Provident voting trust agreement under various state 'blue sky' laws.
 
 
 9
 4) The trustees failed to register the Provident voting trust agreement under provisions of the Securities Exchange Act of 1934 as amended, and thus, solicitation of the consents to extend the voting trust agreement violated the proxy regulations issued by the Securities and Exchange Commission under the 1934 Act.
 
 
 10
 We sustain the district court on the first three issues, but reverse and remand on the fourth. We examine the factual background and the proceedings in the trial court.
 
 I.
 BACKGROUND
 
 11
 The trial court found that the purpose of the 1955 Provident voting trust was to 'stabilize (Provident's) operations, and prevent raids and take-overs.' Approximately 64 percent of Provident's stockholders joined this trust by depositing their stock with the trustees and receiving voting trust certificates in exchange. Provident filed a registration statement for the voting trust certificates pursuant to the Securities Act of 1933.
 
 
 12
 Although the voting trust expired on November 15, 1970, it contained a provision for the extension of the trust reading:
 
 
 13
 Extension of Voting Trust. The Trustees and any and all of the Stockholders becoming parties hereto may, by mutual consent, and from time to time, agree to extend said trust and the terms of this agreement. Any individual stockholder not caring to join in the extension of said trust and the terms of this agreement may on any expiration date surrender his or her Voting Trust Certificate or Certificates and receive a certificate of stock of Provident Life Insurance Company for the number of shares to which he or she is entitled.
 
 
 14
 During 1969, Provident's directors, as trustees of the voting trust, determined that it was in the corporation's best interests to extend the voting trust for an additional 10 years. This decision was influenced in part by the announced takeover attempts planned by Reserve and Midland and their Texas parent corporation, Sammons Enterprises, Inc. Accordingly, beginning early in December of 1969, the trustees, with the help of Provident personnel, solicited existing members of the voting trust for their consent to a 10-year extension of the trust. As a preliminary to their attempts to persuade voting certificate holders to deny their consent to any extension of the trust, Reserve and Midland attempted to procure names and addresses of the members of the voting trust as well as names and addresses of shareholders of the corporation. Initially, Reserve made a written demand to inspect and copy such lists. When this demand was refused, Reserve and Midland instituted lawsuits in North Dakota and in Minnesota state courts. The Minnesota state court dismissed the suit in deference to the action being brought in North Dakota, and Reserve and Midland eventually succeeded in obtaining a stockholders' list from the North Dakota state court. They did not, however, succeed in obtaining the specific names and addresses of members of the first voting trust agreement. Although the trustees filed copies of the voting trust agreement with Provident,[2] including copies of the consents obtained from members of the voting trust, Reserve and Midland could not read the signatures on these documents in some instances nor find any of the addresses because the mailing labels had been removed from the consent forms.
 
 
 15
 Reserve, Midland, and Reserve's subsidiary, American Security Life Insurance Company,[3] had purchased a number of the 1955 voting trust certificates from certificate holders. Reserve and Midland did not consent to the extension of the trust. During the pendency of this case in the trial court, Reserve and Midland exchanged all of their expiring voting trust certificates for Provident common stock. Additionally, Reserve and Midland own a substantial block of shares of Provident common stock and several voting trust certificates in the extended voting trust which were acquired in open market transactions. Reserve and Midland, however, did not acquire any of these voting trust certificates from the trustees of the voting trust or from Provident.
 
 
 16
 Neither the trustees nor Provident filed any registration statement for the extended voting trust certificates with the SEC or any state securities commission. Reserve and Midland, however, contend that Section 6 of the Securities Act of 1933, 15 U.S.C. 77f, and Section 12 of the Securities Exchange Act of 1934, 15 U.S.C. 78l, required the filing of registration data.[4] Moreover, if the 1934 Act required registration, appellants contend also that soliciting the consents to the extension of the voting trust violated the SEC rules governing proxy solicitation.[5] Finally, appellants contend that registration was required in all the states in which solicitations were made by the trustees. With this background, we turn to a discussion of the matters raised on appeal.
 
 II.
 
 17
 THE VALIDITY OF THE VOTING TRUST UNDER NORTH DAKOTA LAW
 
 
 18
 The relevant North Dakota statute relating to voting trusts, N.D.Cent.Code 10-19-35, reads as follows:
 
 
 19
 Voting Trust.-- Any number of shareholders of a corporation may create a voting trust for the purpose of conferring upon a trustee or trustees the right to vote or otherwise represent their shares, for a period of not to exceed ten years, by entering into a written voting trust agreement specifying the terms and conditions of the voting trust, by depositing a counterpart of the agreement with the corporation at its registered office, and by transferring their shares to such trustee or trustees for the purpose of the agreement. The counterpart of the voting trust agreement so deposited with the corporation shall be subject to the same right of examination by a shareholder of the corporation, in person or by agent or attorney, as are the books and records of the corporation, and shall be subject to examination by any holder of a beneficial interest in the voting trust, either in person or by agent or attorney, at any reasonable time for any proper purpose.
 
 
 20
 Reserve and Midland make two contentions in conjunction with this statute: (a) that the extension of the voting trust violated the 10-year statutory limitation, and (b) that because the trustees removed mailing labels from the consents to the extension of the trust agreements, the trustees thereby failed to file a requisite 'counterpart of the voting trust agreement.' The district court rejected both of these contentions and held the extension of the voting trust valid and the filings in compliance with N.D.Cent.Code 10-19-35. We find no North Dakota case law pertinent to the issues raised, and appellants have presented no persuasive authority contrary to the determination of the trial court.
 
 
 21
 North Dakota enacted 10-19-35 in 1957. The parties entered the initial voting trust agreement two years earlier. Appellees thus contend that the 10-year limitation of the statute does not operate retrospectively upon the 1955 trust. We agree. See Western Pac. R.R. v. Baldwin, 89 F.2d 269 (8th Cir. 1937); Oppenheimer v. Cassidy, 345 Ill.App. 212, 102 N.E.2d 678 (1951).
 
 
 22
 The second issue is more troublesome. Although an underlying purpose of 10-19-35 may be the disclosure of adequate information about a voting trust to corporate shareholders and other members of the trust, the statute specifies without helpful elaboration that 'a counterpart of the agreement' be deposited with the corporation. In light of this apparent obscurity within the statute and in the absence of any relevant North Dakota case law, we defer to the trial court's experience in interpreting North Dakota law and its construction of the statute here in question. See Luke v. American Family Mutual Insurance Co., 476 F.2d 1015, 1019 n. 6 (8th Cir. 1972) (original panel opinion), cert. denied, 414 U.S. 856, 94 S.Ct. 158, 38 L.Ed.2d 105 (1973). Thus, we accept the trial court's conclusion that the filing of a true copy of the trust agreement and copies of the executed consents to the extension, even though without addresses, effected compliance with the terms of 10-19-35.
 
 III.
 REGISTRATION UNDER THE 1933 ACT AND STATE LAWS
 
 23
 Section 5 of the Securities Act of 1933, 15 U.S.C. 77e, in general makes it illegal to utilize the mails or other means of interstate transportation or communication in the sale or purchase of securities unless a registration statement for these securities has been filed with the SEC. But 3(a)(9) of the 1933 Act, 15 U.S.C. 77c(a)(9), exempts from registration:
 
 
 24
 any security exchanged by the issuer with its existing security holders exclusively where no commission or other remuneration is paid or given directly or indirectly for soliciting such exchange(.)[6]
 
 
 25
 Reserve, Midland, and the SEC in its amicus brief contend that this exemption is inapplicable, while Provident and the trustees argue the contrary. As a preliminary matter, Provident and the trustees assert that Reserve and Midland lack standing under the 1933 Act to bring this action since those parties did not purchase the securities here in question from the issuer-trustees or from Provident. We considered a similar issue in Greater Iowa Corp. v. McLendon, 378 F.2d 783 (8th Cir. 1967). There we held that the term 'purchasers' as used in 12, 15 U.S.C. 77l, the remedy section for private litigants under the 1933 Act, was limited only to those purchasers of such voting trust certificates who were in privity with the original issuer.[7] Although the circumstances here may be distinguishable from those in Greater Iowa, plaintiffs face a serious question of standing to obtain relief under the 1933 Act. The district court considered the merits of the 3(a)(9) claim for exemption and so shall we, assuming arguendo that standing does exist in order to review the district court's ruling. Since, as we will explain below, the extensions of the voting trust certificates are exempt from registration under the 1933 Act, appellees do not suffer any prejudice by our review of the merits.
 
 
 26
 The SEC as well as Reserve and Midland take the position that the renewal of the voting trust and the resultant issuance of amended or new voting trust certificates does not constitute an exchange of securities by an 'issuer with its existing security holders' within 3(a)(9) but instead amounts to the issuance of a new security required to be registered as prescribed by 6 of the 1933 Act, 15 U.S.C. 77f. To reach this result, they argue that the new and old trusts must be considered separate legal entities under the 1933 Act, regardless of whether state law would characterize the new and old trusts as a continuing single entity. This conclusion rests on reasoning that the original voting trust terminated as an entity in 1970 because the trustees of the existing trust could not compel any certificate holder to participate in any extension of the trust.
 
 
 27
 Additionally, the Commission argues that since the beneficent purpose of the 1933 Act is to promote full disclosure of information thought necessary for informed investment decisions, see Securities & Exchange Commission v. Ralston Purina Co., 346 U.S. 119, 124-125, 73 S.Ct. 981, 97 L.Ed. 1494 (1953), the 3(a) (9) exemption ought to be construed narrowly in order to protect investors such as the present holders of extended trust certificates who should be entitled to the same safeguards afforded shareholders who contemplated exchanging shares for the original voting trust certificates.
 
 
 28
 We would agree with the contention made by appellants and the Commission if the 1955 voting trust said nothing about an extension.[8] Here, however, the original voting trust certificates contained an express provision for extension. Thus, by this language, the parties added an element of flexibility to the initial 15-year time period and evidenced an intent to participate in the voting trust arrangement for such time period as might be reasonably necessary to protect against corporate raiding.
 
 
 29
 We also note that Provident advised the Denver regional office of the SEC of plans by it and the trustees to rely on the 3(a)(9) exemption from registration in planning to obtain consents for an extension of the voting trust for an additional 10 years. Neither Provident nor the trustees received any advice to the contrary from that office. Additionally, one of the attorneys for the Commission informally expressed views to Reserve and Midland, who were then asking the Commission to take steps to stop the solicitation, that the 3(a)(9) exemption applied to the extension of the voting trust. We mention these matters not as acts binding upon the Commission but as illustrations of the reasonableness of Provident's reliance on the exemption theory under the circumstances.[9]
 
 
 30
 In considering whether Provident and the trustees qualify for the exemption under 3(a)(9) in this case, we observe the following: (1) the trustees contacted only the holders of existing voting trust certificates; (2) these certificate holders received no new certificates but rather the old certificates were stamped to show the change in the trust termination date; (3) the voting trust itself was not materially changed except for its extension-- each voting trust certificate holder retained the same equitable interest in the corporation as before; and (4) according to the trial court findings, no commission or other remuneration has been paid or given, directly or indirectly, for soliciting such exchange.
 
 
 31
 In sum, the conduct of the trustees seems to fall within the literal language of the exemption provided by 3(a)(9). The terms of the initial trust which contemplated the likelihood of a continuation beyond 15 years was in fact carried out. Under all the circumstances, we think it was proper for the trial court to factually find and legally conclude that a single continuing trust existed and that the issuer-trust exchanged securities with its existing security holders within the meaning of the exemption from registration provided by 3(a)(9) of the Securities Act of 1933.
 
 IV.
 STANDING AND EXEMPTION UNDER STATE LAWS
 
 32
 Questions of standing and of the applicability of similar exemptions arise under state securities laws. The trustees or Provident's employees on behalf of the trustees made solicitations for 'consents' in 37 states. According to representations made in appellees' brief, none of the state laws authorize a private remedy to parties not in privity with the seller for the failure to register a security. Thus the standing issues represent a serious obstacle to appellants' claims arising under the state statutes. In any event, assuming standing, the state laws applicable here provide for an exemption essentially identical to the 3(a)(9) exemption in the 1933 federal enactment.
 
 
 33
 We note that the Commissioner of Securities of the State of North Dakota advised Provident that no registration was required under provisions of the North Dakota securities laws by reason of an exemption similar to 3(a)(9) contained in the North Dakota securities laws. See N.D.Cent.Code 10-04-06(7). The South Dakota Commissioner of Securities advised Provident that the solicitation for renewal of the existing voting trust was exempt from registration in South Dakota. We find it unnecessary to examine the 'blue sky' laws in all other states in which the solicitations took place. Reserve and Midland make no showing that it acquired any voting trust certificates in any state other than North Dakota and South Dakota. Moreover, appellants have not furnished us with the provisions of any other state statute which might provide a basis for a declaration of invalidity of the voting trust certificates held by them. Accordingly, we believe that these state laws exempt Provident or the trust from registration in the same manner as the 3(a)(9) exemption, and we therefore sustain the district court's ruling that no violation is shown of state 'blue sky' laws.
 
 V.
 SECURITIES ACT OF 1934
 
 34
 Appellants and the SEC contend that if a single continuing voting trust is deemed to exist for the extended period of the trust, the trust was required to register under 12(g) of the Securities Exchange Act of 1934, 15 U.S.C. 78l(g). Concomitantly, they assert that the voting trustees, in seeking to extend the voting trust, solicited a 'proxy or consent or authorization' in contravention of 14(a) of the Act, 15 U.S.C. 78n(a) and the Commission's proxy rules, Rule 14a-1 et seq., 17 C.F.R. 240.14a-1 et seq.
 
 
 35
 The trial court found that there was no duty to register the voting trust certificates and thus no need for compliance with the proxy requirements. We examine these contentions in light of our earlier determination made in Part III of this opinion concerning the 3(a)(9) exemption under the 1933 Act that the voting trust should be considered a single continuing trust extending beyond the initial 1970 termination date.
 
 
 36
 Absent an exemption, 12(g) of the 1934 Act requires an 'issuer' whose securities are traded 'by use of the mails or any means or instrumentality of interstate commerce' to register equity securities if its 'total assets' exceed one million dollars and if the class of equity securities is held of record by 500 or more persons. An 'issuer' includes the trustees of a voting trust under 3(a)(8) of the 1934 Act, 15 U.S.C. 78c(a)(8), and according to Rule 3a11-1, 17 C.F.R. 240.3a11-1, an 'equity security' includes voting trust certificates.[10]
 
 
 37
 The record establishes that more than 500 persons held the certificates issued by the original trust and that more than 500 persons now hold the certificates issued by the extended trust. Therefore, if the voting trust holds 'total assets' exceeding one million dollars, its securities are required to be registered with the Commission pursuant to 12(g). Of course, the trust itself holds no assets except the stock certificates for which the trustees exercise only voting rights and possess bare legal title. Section 12(g)(5) of the 1934 Act, 15 U.S.C. 78l(g)(5), however, gives the Commission the power to define 'total assets' for the purposes of 12(g) and the Commission has by rule provided that the total assets of an issuer whose securities are deposited in the voting trust shall also be deemed to be the 'total assets' of the trust. See Rule 12g5-2, 17 C.F.R. 240.12g5-2. Since the total assets of Provident Life Insurance Company, the original issuer, exceed $84,000,000, the original trust, which held approximately 64 percent of Provident's common stock, and the renewed trust, which now holds about 42 percent of its stock, easily meet the 'total assets' requirement of 12(g), as defined by the Commission rules.[11] Accordingly, under these rules, the district court erred in determining that the trust hled no assets.
 
 
 38
 To be sure, the voting trust certificates which were extended may be viewed as securities issued by Provident, a life insurance company, and thus exempt from the registration requirements of 12(g) pursuant to 12(g)(2)(G), 15 U.S.C. 78l(g)(2)(G), which creates an exemption from registration for 'any security issued by an insurance company.' The availability of this exemption, however, depends specifically upon the applicability of state regulation with respect to annual reports, proxy solicitations, and disclosure of securities transactions by officers, directors, and substantial shareholders. See 12(g) (2)(G)(i), (ii), and (iii), 15 U.S.C. 78l(g)(2)(G)(i), (ii), and (iii). Nevertheless, while the statute may manifest Congress' assumption that state regulation may be an adequate basis for the exemption of an insurance company's stock, there is no suggestion in the staute or its legislative history that such state regulation provides an adequate substitute for registration of a voting trust that holds an insurance company's stock. Thus we hold that the exemption contained in 12(g)(2)(G) is unavailing to the trustees of the voting trust and that the provisions of 12 of the Securities Exchange Act require the trustees to register the voting trust certificates.
 
 
 39
 The obligation to register under 12 brings into play the provisions of 14(a) of the 1934 Act, 15 U.S.C. 78n(a), which reads in relevant part:
 
 
 40
 It shall be unlawful for any person * * * in contravention of such rules and regulations as the Commission may prescribe * * * to solicit * * * any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l (of the 1934 Act).
 
 
 41
 With respect to 14(a), the district court found that if there was a solicitation it was a solicitation by the trustees in respect of the Provident Life common stock, which was to be redeposited in the trust, and not in respect of the trust certificates. Thus the court held 14(a) inapplicable in this case because the underlying Provident common stock as stock of an insurance company is exempt from registration under 12(g) of the 1934 Act.
 
 
 42
 The creation and the extension of the voting trust does amount to a solicitation of a proxy in respect to securities deposited with the trustees. We so held in Greater Iowa Corp. v. McLendon, supra, 378 F.2d at 786. To that extent, the district court was correct in stating that there was a solicitation in respect of the Provident Life stock when the defendants sought to extend the trust and, thus, the transaction fell outside the purview of 14(a). But a further question is presented under the particular facts of this case-- whether the solicitation was also in respect of the trust certificates-- as Reserve and Midland contend. That issue was not resolved in Creater Iowa.
 
 
 43
 Here, as we have already held, the extension of the Provident voting trust constituted a continuation of the initial security; thus the extension of the term of the old trust certificates was exempt from registration pursuant to 3(a)(9) of the Securities Act of 1933. It follows that when the voting trustees solicited the proxy, that is, the 'consent or authorization'[12] of certificate holders to participate in the extended term of the trust, those solicitations were in respect of the trust certificates, as well as in respect of the Provident Life securities.
 
 
 44
 We think that the legislative policy underlying enactment of 14(a) of the 1934 Act supports this legal conclusion. In Greater Iowa, we commented that:
 
 
 45
 The purpose of (14(a)) becomes clear, to provide full and honest disclosure by those who are seeking to maintain or gain control of a corporation through solicitation of the corporate voting rights of the shareholders. Corporate suffrage is an important incident of corporate ownership and is a right deserving of careful protection. Consequently, standards of conduct have been established for parties who seek the voting rights of others, and all contestants for these voting privileges are held to the same high standard of fair play and open disclosure. (378 F.2d at 795.)
 
 
 46
 See J. I. Case Co. v. Borak, 377 U.S. 426, 431-432, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). Moreover, in commenting on the congressional intent to give the terms 'proxy,' 'consent,' and 'authorization' the broadest meaning necessary to effectuate the 1934 Act's salutary purposes, we observed in Greater Iowa:
 
 
 47
 By including all of these words in the disjunctive, we believe Congress intended to cover the entire field of solicitation for corporate control and all of the various solicitation situations which might arise from time to time, whether conventional, novel, irregular or unorthodox. (378 F.2d at 796.)
 
 
 48
 Certainly here the solicitation for the extension of the terms of the trust constituted a solicitation for the trustees' right to exercise indirect control over the corporation for many years since the trustees thereby obtained a continuation of the power to ensure re-election of present directors or replacements friendly to Provident's management.
 
 
 49
 We hold solicitations for the extension of the voting trust in this case amounted to solicitations of proxies and such conduct came within the strictures of the proxy rules as promulgated by the SEC. See Rule 14a-1 et seq., 17 C.F.R. 240.14a-1 et seq. Under these rules, an atmosphere of 'fair play' must pervade the solicitation of proxies so that in struggles for corporate control like the present one, competing interests are furnished equal opportunities to communicate with and thereby influence the shareholders in the exercise of their corporate suffrage rights. Specifically, the SEC has established the requirement that when management of an issuer conducts or intends to conduct a proxy solicitation and receives a written request by a security holder entitled to vote on the matter,[13] management must either mail opposition material of the security holder to enfranchised security holders see Rule 14a-7(b)(1) and (2), 17 C.F.R. 240.14a-7(b)(1) and (2), or furnish the security holder with a reasonably current list of the names and addresses of such security holders and other interested persons, see Rule 14a-7(c), 17 C.F.R. 240.14a-7(c). Here, however, Provident's management and the trustees refused to furnish to Reserve and Midland the names of stockholders, except on order of the North Dakota court, and, successfully resisted the efforts of appellants to obtain a list of the names and addresses of the certificate holders of the voting trust. As a result of this, Reserve and Midland were effectively precluded from an equal opportunity to communicate with the participants of the trust, contrary to the purpose intended by the Commission's proxy rules and 14(a).
 
 VI.
 REMEDY FOR VIOLATING THE 1934 ACT
 
 50
 Reserve and Midland request that we declare the consents to the extension of the voting trust agreement void or voidable, that we restrain and enjoin the appellees from acting under the terms of the trust agreement, and that we require provident and the trustees to make available to appellants the names and addresses of those persons presently holding voting trust certificates in the event further solicitation is permitted.
 
 
 51
 In suits to redress violations of 14(a) of the 1934 Act, federal courts under their equitable powers may grant all relief necessary to effectuate the congressional purposes of the Act. See J.I. Case Co. v. Borak,supra. Cf. Securities and Exchange Commission v. Transamerica Corp., 163 F.2d 511 (3d Cir. 1947), cert. denied, 332 U.S. 847, 68 S.Ct. 351, 92 L.Ed. 418 (1948).
 
 
 52
 Section 29(b) of the 1934 Act, 15 U.S.C. 78cc(b), affords a specific remedy relative to contract rights, and reads in pertinent part:
 
 
 53
 (b) Every contract made in violation of any provision of this title or of any rule or regulation thereunder * * * shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract * * *.
 
 
 54
 This section has been construed to create a rule of voidability at the option of an innocent party. See Greater Iowa Corp. v. McLendon, supra, 378 F.2d at 792, and cases cited therein.
 
 
 55
 Reserve and Midland hold voting trust certificates which they obtained by assignment. According to the terms of the voting trust agreement, 'every transferee of a Trust Certificate or Certificates issued hereunder shall, by the acceptance of such Trust Certificate or Certificates, become a party hereto with like effect as though an original party (to the agreement).' Thus, we think it clear that in this case appellants Reserve and Midland as assignees acquired the contractual rights of their assignors and have become parties to the contract. As such, under the statute, they may avoid the limiting terms of the extended voting trust.
 
 
 56
 As previously noted, the Provident voting trust was initially formed and its term later extended to prevent the raiding of corporate control by such groups as Reserve, Midland, and their parent company, Sammons Enterprises, Inc. The members of that voting trust (other than appellants) may very well wish to continue existing arrangements with the trustees to resist attempts by appellants or others to gain control of Provident. The trial court may take cognizance of this continued effort by shareholders of Provident to present a common front against plaintiffs' efforts to take over their company. Thus, in the exercise of its equitable discretion, the trial court may give Provident and the trustees an opportunity to reaffirm the voting trust with the present certificate holders, other than Reserve and Midland, subject, however, to the requirements of Rule 14a-1 et seq.
 
 
 57
 Accordingly, we remand this case for the entry of a judgment in conformity with this opinion. Should Provident and the trustees seek permission to attempt to obtain reaffirmance of the voting trust with its certificate holders, the district court shall pass on such application and if approved shall enter such orders as may be appropriate to assure that full, fair, and complete disclosure of information is afforded all voting certificate holders by the appellees as well as by appellants.[14] The trial court should issue such other orders as will protect the rights of all parties and retain the status quo of the voting trust, except with respect to the extended voting trust certificates heretofore acquired by Reserve and Midland, pending any resolicitation. As to voting trust certificates obtained by Reserve and Midland prior to the filing of this opinion, Provident will be required to exchange them for the underlying common stock represented by these certificates.
 
 
 58
 We remand with no costs assessed against either party.
 
 
 59
 Remanded.
 
 
 
 *
 G. THOMAS EISELE, District Judge, Eastern District of Arkansas, sitting by designation
 
 
 [1]
 Dakota National Bank is made a nominal party because it is the depository of the shares of stock represented by the voting trust certificates
 
 
 [2]
 Provisions of the North Dakota Century Code call for a corporation to make available for examination by a shareholder to the same extent as books and records of such corporation 'the counterpart of the voting trust agreement so deposited with the corporation.' N.D.Cent.Code 10-19-35
 
 
 [3]
 Before December 22, 1969, Reserve owned all of the common stock of American Security Life Insurance Company. On December 31, 1969, and prior to the institution of this lawsuit, the latter company was merged into Reserve, thereby making Reserve the owner of all of the Provident voting trust certificates formerly held by American Security
 
 
 [4]
 Although no registration was made at times here material, the trustees at the suggestion of an SEC staff member, filed a registration statement in February of 1971 relating to the voting trust certificates as extended to 1980 under 12(g) of the 1934 Act, 15 U.S.C. 78l(g). This registration became effective April 10, 1971. The trustees made this registration under protest, asserting the inapplicability of 12 to the trust
 
 
 [5]
 See 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. 78n(a), and the Commission's proxy rules promulgated thereunder, Rule 14a-1 et seq., 17 C.F.R. 240.14a-1 et seq., discussed in Part V of this opinion infra
 
 
 [6]
 In conjunction with this section, the Commission has promulgated Rule 149, 17 C.F.R. 230.149, which attempts to further explain the term 'exchanged' as used in 3(a)(9) as follows:
 The term 'exchanged' in section 3(a)(9) * * *, shall be deemed to include the issuance of a security in consideration of the surrender, by the existing security holders of the issuer, of outstanding securities of the issuer, notwithstanding the fact that the surrender of the outstanding securities may be required by the terms of the plans of exchange to be accompanied by such payment in cash by the security holder as may be necessary to effect an equitable adjustment, in respect of dividends or interest paid or payable on the securities involved in the exchange, as between such security holder and other security holders of the same class accepting the offer of exchange.
 
 
 [7]
 But see Kinsey v. Knapp, 154 F.Supp. 263 (E.D.Mich.), rev'd on other grounds, 249 F.2d 797 (6th Cir. 1957), cert. denied, 356 U.S. 936, 78 S.Ct. 778, 2 L.Ed.2d 812 (1958), which permitted an assignee of shares bound by a voting trust to maintain a suit attempting to void the voting trust agreement because it was not registered under the Securities Act of 1933. However the court's decision seemed to be grounded more in equity than in the statutory provisions of the Act. Cf. Corporation Trust Co. v. Logan, 52 F.Supp. 999 (D.Del.1943)
 
 
 [8]
 Two leading authorities on securities laws have indicated that an extension of a previously existing voting trust falls within the 3(a)(9) exemption when the original trust agreement contains a provision for a renewal of the trust and there is compliance with the other conditions of the section. See 1 Loss, Securities Regulations 574 (2d ed. 1961); H. Sowards, The Federal Securities Act in 11 Business Organizations 3.10 at 20-1 n. 56 (1973)
 
 
 [9]
 As a collateral issue in this lawsuit, Provident has argued that the inaction of the SEC's Denver office of the applicability of the exemptions under 3(a)(9) of the 1933 Act, 15 U.S.C. 77c(a)(9), and the views expressed by the SEC attorney that no registration of the extended voting trust was necessary under 3(a)(9), binds the Commission and estops that body from taking a contrary position at this time since such opinions were the equivalent of a 'no action' letter. We reject this argument. First, a 'no action' letter was not issued by the SEC within its authorized procedure nor is it apparent that a 'no action' letter was ever requested. See Lowenfels, SEC 'No-Action' Letters: Some Problems and Suggested Approaches, 71 Columbia L.Rev. 1256, 1256-58 (1971), and Lowenfels, SEC No-Action Letters: Conflicts With Existing Statutes, Cases and Commission Releases, 59 Va.L.Rev. 303, 320-21 (1973). At best, Provident received only an opinion of a staff member of the SEC. As such, 17 C.F.R. 202.1(d) comes into play. That regulation in part reads, 'opinions expressed by members of the (SEC's) staff do not constitute an official expression of the Commission's views * * *.' Cf. Kixmiller v. SEC, 492 F.2d 641 (D.C.Cir. 1974). Moreover, as a general proposition, such inaction does not estop the Commission from assuming a contrary position later. See Section 26 of the 1934 Act, 15 U.S.C. 78z; Capital Funds, Inc. v. SEC, 348 F.2d 582, 588 (8th Cir. 1965). Cf. SEC v. Culpepper, 270 F.2d 241 (2d Cir. 1959)
 
 
 [10]
 Rule 3a11-1, 17 C.F.R. 240.3a11-1, was promulgated by the Commission pursuant to 3(a)(11) of the 1934 Act, 15 U.S.C. 78c(a)(11), which defines 'equity security' to include 'any stock or similar security' and authorizes the Commission to further define the term
 
 
 [11]
 Although the appellees contend that the Commission lacks authority to so define the term 'total assets' of a trust in this manner, we note than 12(g) (5), 15 U.S.C. 78l(g)(5), permits the Commission to define "total assets' * * * as it deems necessary or appropriate in the public interest or for the protection of investors in order to prevent circumvention of the provisions of (12(g)).' We think the adoption of the Commission's attribution rule relating to trusts is in accord with the purposes stipulated by this statute
 
 
 [12]
 Rule 14a-1(d), 17 C.F.R. 240.14a-1(d), defines the term 'proxy' to include 'every proxy, consent, or authorization within the meaning of section 14(a) of the (1934) Act.'
 
 
 [13]
 Since at material times, Reserve or Midland held voting trust certificates which had been obtained from shareholders who initially joined the voting trust in 1955, they were entitled to invoke the applicable provisions of Rule 14a-7, 17 C.F.R. 240.14a-7
 
 
 [14]
 The following language from Greater Iowa Corp. seems most apt to any resolicitation: We do think that any solicitation for proxies or authorizations or consents to a particular course of conduct affecting corporate operation should be conducted under the rules of full, fair and complete disclosure * * *. Management must adhere to this standard and the wellmeaning dissidents should do likewise. It is only by the application of this single standard of conduct that the corporate suffrage of each security holder can be fully protected. In this struggle for corporate dominance or control, a meaningful choice should be presented to the security holder, who is in turn fully armed with a complete and fair disclosure of all relevant information pertaining to the exercise of his corporate suffrage. (378 F.2d at 798.)